Loring, J.,
delivered the opinion of the court:
The facts found and the petition present two principal claims:
1st. For extra work; that is, for labor and materials furnished for work not required by the original contract, but by the alterations of it made by the United States.
2d. For the increase in the price of labor and materials for work required by the contract, the cost of which was enhanced during the delay consequent on the alterations made.
And the petitioners claim on different grounds. William A. Steel claims on an assignment made to him by Charles W. McCord, after the execution and before the performance of the original contract for the construction of the Etlah.
Charles P. Chouteau claims as surviving partner of Chouteau, Harrison & Yalle, on an assignment made to that firm by the assignee in bankruptcy of Charles W. McCord, of all his title and interest, on the 15th August, 1868. The rights of the two petitioners must, therefore, be considered separately.
The assignment made in the proceedings in bankruptcy to Chouteau, Harrison & Yalle, under which Charles P. Chou-teau claims as the surviving partner of that firm, was of the claim first stated, and of that only. The assignment states it in these words: “A certain claim against the United States Government for extra work performed and material furnished to said Government by said Charles W. McCord in the building and construction of the iron-clad monitor Etlah, under a contract with said Government.” Thus the claim assigned by the proceedings in bankruptcy was the claim for extras only; and that the parties understood this at the time is proved by the fact that, in the original petition filed by George W. McCord *165 on the ,25th October, 1869, for the use of Chouteau, Harrison & Valle, no other claim was made than that for extras.
Then the assignment in bankruptcy expressly conveyed the title and'interest which Charles W. McCord had in such claim for extras on the 15th of August, 1868. And the fact is found that Charles W. McGprd was paid for these extras, in all, $210,991, and that of t<is sum the last payment, of $31,111, was " made on the 11th of May, 1866, and that then Charles W. McCord receipted for the extras expressly in full.
‘And there is nothing in the evidence to suggest that Charles W. McCord then claimed more, or gave the receipt in full under duress or pressure of any kiud, or in any ignorance or mistake of the facts, and the words of the receipt informed him fully of its nature. Such a receipt, so given, thereupon discharged the debt it specified, for it declared that intention of the parties. And as the claim for extras was thus discharged before the assignment in bankruptcy, Chouteau, Harrison & Valle took nothing thereby, and Chouteau, as surviving partner of that firm, is entitled to nothing here.
All that remains to be considered are the claims of William A. Steel, and he claims an interest*of one-third in all the claims sued, under an assignment made to him by Charles W. McCord after the execution and before the performance of the contract for the construction of the Etlah.
But Steel’s claim as to the extras is barred by the final settlement for them made between Charles W. McCord and the United States, on the 11th May, 1866, by the payment of $31,111, and the receipt in full stated above, because that settlement was made without notice or knowledge on the part of the United States of the assignment claimed by Steel.
And this disposes of the claim for extras altogether.
As to the other items of claim, Steel’s title is rested on the averment made in the original petition by Charles McCord. After stating the contract for the construction of the Etlah, the petition proceeds as follows: a Petitioner further states that, after such contract was executed, he made a subcontract for the construction of said steam-battery with the firm of McCord & Co. and William A. Steel, in which subcontract the said McCord & Go. had an interest of two-thirds and the said Steel an interest of one-third in the original contract.” This is an averment that Charles McCord, by the subcontract men *166 tioned, assigned bis contract for tbe construction of tbe Etlab to McCord & Co. and William A. Steel, in tbe proportions of two-tbirdsto tbe former and of one-third to the latter; and Steel’s title is more distinctly stated in the amendment to the original petition, filed by tbe present petitioners since tbe hearing of tbe case. In that amendment the words of. the present petitioner are as follows: “They state and aver the-fact to be, as was alleged in the original petition of said Charles W. McCord, filed in this case in his life-time, that the said William A. Steel, during the performance of said contract to build said steam-battery, and before the bankruptcy of said Charles W. McCord, became an equitable owner of the one-third interest-in said contract with said Charles W. McCord, and was, and still is, and ever has been, the equitable owner of the one-third part of the' said claim against the United States herein set out.” This extract distinguishes between the contract with Charles W. McCord “to build said steam-battery” and the claim against the United States for money due for the performance of that contract; audit founds Steel’s claim to a proportion of the money due on the assignment to him of one-third of the contract. And in the same amendment the petitioners state distinctly Steel’s ownership in the contract for the construction of the Etlah, as follows : “ That by the terms of said contract said steam-battery was to be completed on or before the 24th day of February, 1864; that after the execution thereof your petitioner, William Steel, became the owner of one-third interest in said contract.”
Upon averments like these, which are the petitioner’s own statement of his title,’ it must necessarily be held that the assignment alleged was of the contract for the construction of the Etlah, as distinguished from an assignment of the claim ’ for the money due on the performance of the contract.
If this alleged assignment of the original contract for the construction of the Etlah were proved, then, under the Act 17th July, 1862, (12 Stat. L., p. 596,) which prohibits the assignment of contracts made with the United States, the assignment would be utterly void, and convey no title or interest to the as-signee ; and, moreover, by the other provisions of the statute, the contract assigned would be anulled as against the United States, so that it could not be a ground of action here for any one.
*167 In the jurisdiction of this court there is a wide difference between the assignment of a contract made with the United States and an assignment of the claim for the money due from them for the performance of the contract. For the former, being prohibited by statute, is illegal, and the assignment is a mere nullity, and passes no title, either legal or equitable, to the assignee, while the assignment of a claim for money due from the United states is lawful, and provided for by the statutes constructing this court; and, therefore, here the title of an assignee of a claim for money due from the United States is not merely equitable, but, by force of those statutes, is strictly a legal title, and as much so as the title of the vendee of a chattel; for the statutes make such claim for money due as transferable as a chattel, and, therefore, the assignee of such a claim may sue it here in his own name.
But in this case, whether the assignment was of the contract itself or of the claim for the money due for the performance of the contract, it is denied by the defendants, and put in issue by the general traverse “ of each and every allegation” of the petitioners, and it is not proved. The averment is that the assignment.was made in a subcontract for the construction of the Etlah. And where a contract is alleged it must be proved, because its effect is a matter for legal construction, and not for averment by parties. And in this case the subcontract, if proved, might show that the assignment was of the claim for the money sued for, which the parties must have intended, and that the averment in the petition that the assignment was of the contract itself was a mere mistake in statement by the client in the case. But the subcontract, by which it is averred the. assignment was made, if in writing, is not produced, and whether it was in writing or by parol, not a witness testifies to it, and there is nothing in the evidence from which such assignment or any contract with Steel individually can be inferred.
All that is shown by the evidence is that the hull of the Etlah was built at the ship-yard of the firm of McCord, Steel & Bastor, and that sometimes the clerk and sometimes Mr. Steel paid the workmen employed there; that iron-work was done at McCord & Co.’s foundery and machine-shop, and other work elsewhere; that Chouteau,Harrison & Yalle furnished to McCord & Co. iron for the Etlah, and that Charles W. McCord, *168 and sometimes Mr. Steel, ordered iron; that iron was at first charged to the firm of McCord, Sanger & Steel, and then to McCord & Co., who paid Chouteau, Harrison & Yalle $109,000 to $110,000 for iron, excepting $12,725.48, for which McCord & Go. gave their notes.
These dealings with the various firms mentioned may show that they were resorted to in the construction of the Etlah, as were other persons at other places, or this evidence may tend to show subcontracts with those firms for the construction of the Etlah; but it does not show or tend to show any assignment to or contract with William A. Steel individually, or that he individually furnished or paid for labor or materials for the Etlah, or has any ground of claim against the United States.
The other items of claim, viz, for gun-carriages, insurance, protection of the Etlah against ice-gorge, <&c., were not proved at all.
As to the claim for guu-carriages, $7,500, the contract provided for two gun-carriages, which were not furnished; but two others were substituted for them, which cost $7,500; and as extras Charles W. McCord could only claim that arnouut, less the cost of the gun-carriages contracted for and not furnished. He received the full contract price, and over and above that, for two gun-carriages, $3,400, and he receipted for this as the amount due, “ less the gun-carriages contracted for; ” and there was nothing to show that what he received for gun-carriages in the contract price and the $3,400, taken together, left anything due.
As to the claim for extra insurance, $2,400, for protection of the ship against ice-gorge, &c., $2,812.88. These related to the detention of the vessel at Saint Louis after her completion. The fact of the detention was shown, but its duration was not shown, and no evidence whatever was given of the expenditures made or incurred. The court, therefore, had no means of making any allowance for these items, and it was not to supply evidence which is or ought to be in the possession of the claimants.
But we think that in this case, apart from the considerations previously stated, no ground of action against the United States is shown, for they are not shown to have been in default.
The contract for the construction of the Etlah provided that alterations might be made from the original specifications, and *169 that, if they caused extra expense, that should be paid for ; and if they effected a reduction of the cost, that should be subtracted from the contract price.
This privilege of the United States to make alterations on the terms stated being expressly provided for in the contract, the contract price related to that privilege as much as to any other provision in the contract, and therefore it must be taken as included in that price, and paid for in it. And the United States cannot be held liable in damages for exercising a privilege they had purchased, but only for abusing it; and the fact ^ is found that they did not abuse it, but made the alterations shown without unreasonable delay. And this has reference, as the parties must have had, to the nature of the undertaking.
When the contract for the construction of the Etlah was made, the specifications were doubtless as perfect as the knowledge of the subject then permitted, and it was then uncertain whether any alterations would be made, and therefore the time fixed by the contract for its performance was the time required for the construction of such a vessel as was then designed; and the evidence is that the time fixed was sufficient for that purpose. But an iron-clad steam-battery was then a novelty in . naval construction, for the battle of the monitors in Hampton Koads, in the previous summer, had made, as has been truly said, as sudden and complete a revolution in naval warfare as was made by the introduction of gunpowder; and this revolu- / tion required changes in almost every particular of that multifarious combination without parallel, which now makes a ship of war and fits her to struggle with the elements and with adversaries; and the effect of any change could be but imperfectly ascertained beforehand by science and forethought, and the evidence shows that changes from plans elaborated by naval engineers and constructors were continually demanded by the experiences of iron-clads under fire in the service; and this accounts for the changes shown, that, according to the testimony, resulted in a different vessel from that originally designed.
And it was these changes which produced the extras which make the first claim considered, and for which Charles W. McCord in his life-time receipted in full, and for which he re- *170 ceivecl altogether $210,991 over and above the contract price of $386,000, which was also paid him in full.
And as to the second claim, of an addition to the contract price, it is for labor and materials required by the contract and furnished under it; and it is rested solely on the ground that the prices of these rose during the delays experienced from the changes in the currency and political events, which increased the prices of everything. But the United States, as a contractor, not being in fault for the delays, is no more liable for such. increase of prices than any individual contractor would be.
On the whole case the judgment of the court is that the petition be dismissed.
Nott, J., did not sit in this case, and took no part in the decision.