**GENERAL DYNAMICS CORPORATION**

v.

**The UNITED STATES.**

No. 267–70.

United States Court of Claims.

Oct. 18, 1978.

458

Harvey G. Sherzer, Washington, D. C., for plaintiff. Gilbert A. Cuneo, Washington, D. C., attorney of record. Sellers, Conner & Cuneo, David V. Anthony and Pettit, Evers & Martin, Washington, D. C., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Morris Amchan, Dept. of Navy, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This breach of contract and Wunderlich Act case is before the court on plaintiff's

request, pursuant to Rule 54(b)(3), for review of Trial Judge C. Murray Bernhardt's recommended decision and conclusion of law. Plaintiff seeks to recover certain additional costs incurred by reason of alleged constructive changes of its contracts to build nuclear submarines for the Navy. The Armed Services Board of Contract Appeals, in a decision dated May 17, 1973, ASBCA No. 13885, 73–2 BCA ¶ 10,160, held that these costs are not recoverable. In his recommended decision of May 23, 1977, the trial judge sustained the board. We agree with the conclusion reached by the trial judge, but modify and expand his analysis in order to show we have considered and do not agree with the contentions made by plaintiff concerning the liability of the government to absorb the costs at issue.

Three contracts are involved in this case. The first NObs–4355, was awarded to the Electric Boat Division of General Dynamics, on June 14, 1960, for the construction of three nuclear-powered attack submarines designated SSN 613, 614, and 615. The submarines were to be constructed at plaintiff's Groton, Connecticut shipyard, for a contract price of $59,862,606. The SSN 613 is not in dispute here.

The other two contracts were originally awarded to the Bethlehem Steel Company for the construction of nuclear submarines at Bethlehem's Quincy, Massachusetts shipyard. Contract NObs–4509 was awarded on November 30, 1961, for construction of the SSN 638. The contract price was $28,456,-000. On August 22, 1962, contract NObs–4583 was awarded for the construction of the SSN 649. The contract price was $33,-500,000. Neither of these contracts was awarded on the basis of competitive prices as Bethlehem had not been the low bidder. The Navy recognized that even with generous price allowances for Bethlehem's noncompetitiveness, the contracts were losing propositions for the company. The awards were made in the interest of the national defense, as a means of preserving the Quincy yard for the construction of nuclear submarines.

Shortly after these contracts were awarded to Bethlehem, that company decided to sell the plant, by then a losing enterprise. On December 31, 1963, plaintiff purchased the Quincy shipyard for $5,000,000. The sale was considered to be mutually beneficial. Plaintiff's motivations for the purchase were mixed: in part to help the Navy and itself by providing additional facilities for performance under the Groton and Quincy contracts, and in perhaps greater part to enhance its own chances of participation in a prospectively ambitious program for building nuclear surface ships, a program which never materialized. For its part, Bethlehem was happy to be extricated from the submarine contracts with their promised heavy losses. Bethlehem had never build a submarine. General Dynamics had been producing them for many years. As part of the sale Bethlehem assigned its rights and interest in contracts NObs–4509 and NObs–4583 to plaintiff. On December 31, 1963, a tripartite novation agreement was executed by plaintiff, Bethlehem, and the United States, the Navy agreeing to the assignment of the contracts. At the time of the assignment some preliminary work had been done on the SSN 638 then scheduled for delivery on May 30, 1966; no work had yet started on the SSN 649, which was to be delivered by December 26, 1966.

The Groton contracts (SSN 614, 615) and the Quincy contract NObs–4509 (SSN 638) were awarded as Class 593 submarines. The other Quincy contract was a Class 637 submarine. Later the first three were redesignated Class 637. In April 1963 the *U.S.S. Thresher*, a Class 593 submarine, was lost at sea with its entire crew. Immediate naval inquiry into the possible causes of the catastrophe prompted accelerated comprehensive safety changes in specifications for all four submarines, as well as for several others in progress at Groton. The initial format of these changes to the contract specifications was issued in December 1963 after months of conferences, and thereafter remained in flux over many months of further revision. One factor underlying the extensive changes, known as the "subsafe" program, was the inability of the Navy to

pinpoint with precision the actual cause of the sinking. Of course, as the board states, the design of complex submarines such as those constructed by plaintiff normally undergoes change as construction progresses and superior solutions are developed to continuing problems.

In December of 1963, when plaintiff was acquiring the Quincy facility, and the subsafe initial format was issued, plaintiff was about halfway through completion of the SSN 614 and 615 at Groton. In April 1964 plaintiff, with the approval of the Navy, towed the SSN 614 and 615 from Groton to Quincy for completion. Both yards were concurrently busy with numerous government marine construction contracts for other vessels. As well, the subsafe changes, one of which called for the lengthening of the submarine hulls, caused disruptions in schedules, creating conflicts in availability of the facilities at Groton. A major obstacle was the unavailability of the graving dock at Groton for immediate construction. To relieve the congestion at Groton, plaintiff suggested to the Navy that the SSN 614 and 615 be transferred to Quincy to make possible earlier delivery of the submarines. The transfer also provided a safer environment for construction than was available at the overcrowded Groton facility. Plaintiff also indicated that the ships would have a high priority at Quincy, and that substantial economic benefits would accrue to all concerned. In reaching this conclusion, plaintiff believed it would be able to take advantage of a rollover of skilled Quincy installation employees from SSN 614 and 615 to the next ships, the SSN 638 and 649 originally contracted to Bethlehem. At the time the transfer was contemplated, the estimated times for completion operated to provide a meshing of the contracts which would enable a convenient rollover. The Navy consented to the move, principally reasoning that the immediate availability of a graving dock at Quincy, where the SSN 614 and 615 would not be subordinate to other contracts, would make possible an earlier delivery date. Having determined that a transfer would in no way harm the government's interest, Navy officials actually stated that under the circumstances "[t]o deny the company opportunity to use its own facility * * * would appear to be a capricious action."

Because of the continuing modifications to the submarine designs the final delivery date on all the submarines was postponed more than once. For example, in 1963 plaintiff forecasted a nine month delay in the delivery dates for the SSN 614, 615, which had originally been scheduled for completion by February 9 and June 9, 1965, respectively. Numerous problems were encountered in construction, among these radiographic test problems, torpedo alignment corrections, and problems with construction welds. In June 1964 plaintiff was predicting a 17 month delay. Actual delivery of the SSN 614 did not occur until November 16, 1965. The SSN 615 was not delivered until January 25, 1968. The Board found that the delay was contributed to by many factors, including a constant parade of changes. Another problem was the lack of adequate skilled labor and supervisory personnel at Quincy. Plaintiff had rehired many of the Bethlehem employees, who were unskilled in submarine construction, at lower wages than Bethlehem had paid. The combination of the inexperienced labor, with numerous changes to an already complex design, resulted in many errors and the need for much rework. The rate of progress in building the SSN 614 and 615 was consequently much slower than was predicted when the transfer was effected, so that plaintiff was unable to take advantage of a rollover of the by then experienced labor from the earlier contracts to construct the submarines under the Bethlehem contracts.

Plaintiff seeks recovery from the government of what it terms the "impact" losses suffered by reason of plaintiff's inability to put into effect its rollover plan. In essence, plaintiff claims that it suffered losses, found by the board, without present dispute, to total $12,282,523, about half the total amount originally claimed by plaintiff, allegedly brought about by the government's interference with and disruption of

plaintiff's "rollover" plan of sequential crew deployment to produce all four submarines as economically as possible. Unable to achieve a timely rollover of SSN 614 and 615 craftsmen to the SSN 638 and 649, plaintiff was forced to rely on "green labor" to construct the latter ships, greatly increasing costs and substantially delaying construction. Plaintiff submits that the facts of this case lend themselves to two alternate theories of recovery. One is that the numerous change orders issued by the government were so voluminous and massive as to constitute a breach of contract under the cardinal change doctrine. Under this theory, plaintiff argues it is entitled to full breach damages, which would include recovery of these losses as consequential damages. Plaintiff's second legal theory, which it argued before the board is that the change orders on the SSN 614 and 615, by extinguishing the vested rights of the other ships to use these resources, constituted a constructive change to the SSN 638 and 649 contracts. Plaintiff suggests that it would also be possible to characterize the facts as giving rise to a partial suspension and then acceleration under the Suspension of Work and Changes clause.

The decision by the Armed Services Board of Contract Appeals commendably provides a detailed and thorough discussion of the facts surrounding the case. In summarizing these facts, before going on to apply its legal conclusions, the board noted that at the time plaintiff transferred its Groton ships to Quincy it had neither formulated nor communicated a rollover plan to the Navy, and that instead, the principal reason for the transfer was plaintiff's desire to relieve the congestion at Groton, and that the Navy consented to the move simply to accommodate plaintiff in the use of its newly acquired facility. In addition, the board found, as a matter of fact, that the transfer, and therefore the "impact" damages became possible only as a result of plaintiff's acquisition of the Quincy yard. According to the board the "impact" situation was therefore created solely by plaintiff, regardless of government actions subsequent to the transfer. The board similar-

ly concluded that plaintiff should have known that the subsafe program was subject to fluctuation and uncertainty at the time of the transfer. The board therefore held that plaintiff must be deemed to have assumed the risk of potential complications in the subsafe program which might delay completion of the SSN 614 and 615. Moreover, the board also found that the three contracts at all times were administered separately, and did not ever consist of a single program of construction.

The board, applying these facts, concluded that the subsafe changes ordered in the Groton, or impacting contract, did not amount to a constructive change in the Quincy, or impacted, contracts. In the board's view the government was reasonably exercising its legal right to order changes in the first contract, and plaintiff assumed the risk that the contracts would not continue to "fit" so as to enable a convenient rollover of labor from one contract to the next. The board also considered that the novation agreement executed at the time of the purchase provided a further obstacle to recovery in that paragraph 16 of the novation barred the recognition of or liability for certain cost increases in novated contracts. The board concluded that the impact costs rose directly out of the purchase of Quincy by plaintiff and the concurrent assignment of the contracts. The link between the novation, the transfer of the Groton contracts, and the existence of "impact costs" was undeniable and plaintiff was responsible for the creation of the impact costs as a result.

One of plaintiff's criticisms of the board's decision is that what the board characterizes as its findings of fact, in many instances are perceived by plaintiff to be at best mixed issues of law and fact. For example, plaintiff is critical of the board's statement of "fact" that plaintiff caused the "impact" damages itself by transferring the two vessels to Quincy. Plaintiff also disagrees with the board's statement that plaintiff had no construction plan involving rollover of labor from the Groton contracts to the Quincy contracts. Plaintiff in fact notes

that it was not even necessary for such a plan to have been elaborated to the government, but that its existence should have been obvious from the surrounding circumstances. Moreover, this finding, according to plaintiff, is contrary to logic in view of the "fit" of the successive contracts' delivery schedules at the time of the transfer, a fact which the board did find.

■ Plaintiff in its Count I insists that the totality of the changes ordered in the Groton submarines under contract NObs–4355, were such as to constitute a "cardinal change." It appears logical to dispose of this issue first, since a claim for redress for cardinal changes, if valid, is a breach claim, and it takes the case outside the jurisdiction of the board, rendering its findings gratuitous. *Edward R. Marden Corp. v. United States*, 442 F.2d 364, 194 Ct.Cl. 799 (1971). On the other hand, absent a "cardinal change," the board findings can enjoy their usual finality as they were relevant to issues properly before the board.

■ The changes clause vests in the contracting officer discretion to make changes "within the general scope of the contract." *See, e. g., Carl M. Halvorson, Inc. v. United States*, 461 F.2d 1337, 1349, 198 Ct.Cl. 882, 903 (1972); *Law v. United States*, 195 Ct.Cl. 370, 383 (1971). Such changes may be by agreement or unilateral order. An order change determined to be outside the scope of the contract is an abuse of the contract right, *Law, supra*, and is a cardinal change. *Edward R. Marden Corp., supra*. Generally such a change represents a large increase in the contract burdens: usually more work, but also it may be withdrawal of promised government-furnished equipment, requiring the contractor to purchase or rent it if possible at all from a competitor as in *Allied Materials & Equipment Co. v. United States*, 569 F.2d 562, 563–64, 215 Ct.Cl. 406, 409–10 (1978); or a requirement that the contractor replace at its own expense a large hangar that had collapsed owing to defective government design as in *Edward R. Marden Corp., supra* * * * Under established case law, a cardinal change is a breach. It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. * * * [This doctrine is judge-made] "to provide a breach remedy for contractors who are directed by the government to perform work which is not within the general scope of the contract." * * *

■ Since the contract embodies a changes article, obviously some changes are within the scope of the contract. As said in *Edward R. Marden Corp., supra*, 442 F.2d at 369, 194 Ct.Cl. at 808, there is no automatic or easy formula to determine whether a change is beyond the scope or not. Each case must be analyzed on its own facts and circumstances giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole. In *Law v. United States, supra*, it is held that otherwise proper changes are not converted into abuse of discretion merely by unfortunate timing that made them needlessly disruptive.

In *Air-A-Plane Corp. v. United States*, 408 F.2d 1030, 187 Ct.Cl. 269 (1969), it was held a trial was necessary to determine if the changes in a smoke generator contract were cardinal. Relevant matters to be considered were stated to be the number of changes, the number of parts changed and number left unchanged, the character and timing of the changes, and the extent of the engineering, research, and development plaintiff had to do. The case was settled, 189 Ct.Cl. 578 (1969), so unfortunately we do not have the bench mark a final decision on these matters would have given us. In the *Allied Materials & Equipment Co.*, case, *supra*, we likewise held a trial necessary, since a failure to furnish promised government equipment would often be remediable under contract clauses written for the purpose.

■ Under the *Air-A-Plane Corp.* criteria, the question of a cardinal change in contract NObs–4355 might be close and triable. There is, however, another factor.

The *Thresher* loss presented the contracting officer with a national calamity, urgently demanding a rigorous search for all possible submarine defects and immediate measures for their correction. That the reasonable and anticipated use of the changes article includes this kind of response to this kind of crisis, is established by ancient and venerable authority. *McCord v. United States*, 9 Ct.Cl. 155 (1873), aff'd sub nom. *Chouteau v. United States*, 95 U.S. 61, 24 L.Ed. 371 (1877). This case involved construction for the Navy of the *Etlah*, a Civil War monitor, and the contract embodied what is said to be the earliest form of changes article. vom Baur, *The Origin of the Changes Clause in Naval Procurement*, 8 Public Contract Law Journal 175 (1976). We are indebted to Mr. vom Baur's article for pointing out the significance of the case. The facts reflect the discomfiture of the earlier monitors in their attack on Charleston, South Carolina on April 7, 1863, and the administrative decision in Washington to take full advantage of the lessons of this and other combats by ordering improvements in monitors under construction, regardless of delay and cost. Mr. Stimers, the "general inspector" said of the changes ordered in the *Etlah* —

" * * * You will understand, therefore, why it was that I should send constant instructions to Mr. McCord [the builder], directing him to make his vessel different from what he had contracted to do; why I sent him drawings that differed from those specified in his contract. You will find, too, that these might be very material, as they certainly were. The acts, therefore, which *I performed, which affected Mr. McCord and affect this case were to direct him to make a different vessel from the one he contracted to do.*" [Emphasis in original—9 Ct.Cl. at 161.]

The court held that all changes were within the rights the government obtained under the changes article, provided only they were paid for— .

* * * And the United States cannot be held liable in damages for exercising a privilege they had purchased, but only for abusing it; and the fact is found that they did not abuse it, but made the alterations shown without measurable delay. * * * [9 Ct.Cl. at 169.]

The court, per Judge Loring, then referred to the complete transformation in naval warfare caused by the introduction of armored ships—

* * * [T]his revolution required changes in almost every particular of that multifarious combination without parallel which now makes a ship of war and fits her to struggle with the elements and with adversaries; and the effect of any change could be but imperfectly ascertained beforehand by science and forethought, and the evidence shows that changes from plans elaborated by naval engineers and constructors were continually demanded by the experiences of ironclads under fire in the service; and this accounts for the changes shown, that, according to the testimony, resulted in a different vessel from that originally designed. [*Id.*]

The submarines here involved, like the monitors, carried the technology of their time to its outer limits; they were when they worked formidable implements of war; and submarines, like monitors have been often also dangerous to their own crews, producing traumatic disasters and crash programs of correction. The very survival of the nation might have been thought to be involved in the prompt correction of known design defects. The *McCord* court, in determining whether the changes article was abused, looked to these circumstances and did not confine itself, *e. g.,* to comparing the number of parts changed and unchanged. This technique is sufficient for a smoke generator contract, such as the one involved in *Air-A-Plane*, to determine if changes ordered in the aggregate are cardinal ones, but those who contract to build submarines must take into account what is likely to occur in submarine development. We think plaintiff might have hoped to complete its submarines without disruption by change orders, but could not have reasonably counted on it. Absent abuse of

discretion in issuing change orders, plaintiff agreed to look to the contract for compensation for the added cost of any changes ordered. We further do not think a trial is necessary to determine if the changes were cardinal because plaintiff relies on the board record to establish its cardinal change claim, i. e., to establish abuse of discretion, waiving a trial here on the issue, and it does not point to anything in that record that shows us that any abuse of discretion occurred.

Accordingly, the defendant is entitled to summary judgment under Count I, the board had jurisdiction, and its fact findings, when supported by substantial evidence, are binding here. This includes its ultimate fact conclusions and leads us to Count II, in which plaintiff seeks relief under its contracts, following Wunderlich Act procedure. In passing on Count II, we must and necessarily do presume that all changes ordered were within the scope of the respective contracts to which they applied.

We need not, however, indulge in a lengthy analysis of the validity of plaintiff's objections to the board's findings. In our view, even accepting arguendo plaintiff's version of the facts, i. e., that the rollover plan existed at the time of the transfer of the SSN 614 and 615, and should have been discerned by defendant, plaintiff is still not "in free" for reasons we will state.

Plaintiff notes that it should have been obvious to all concerned that the purpose of moving the submarines from crowded Groton to Quincy was not merely to relieve the congestion at Groton, but also to take advantage of the opportunity to apply experienced labor from the SSN 614 and 615 to the Bethlehem contracts. It is suggested that this point was made at least obliquely when plaintiff indicated that substantial costs savings could be achieved through the transfer. There is also oral testimony by a defense witness to the effect that rollover of experienced personnel from one contract to another is standard practice in the shipbuilding industry. The difficulty is that as the board notes, with substantial evidence to corroborate its finding, the rollover plan,

whether or not in existence at the time of the transfer of the vessels, was never formally communicated to the Navy. Certainly the Navy never acknowledged its awareness of the rollover plan. The written memoranda pertaining to the Navy's consent to the transfer simply refer to a willingness by the government to accommodate plaintiff in its attempt to make full use of the new facility. There is no indication in the document consenting to and approving the transfer that the government contemplated altering the contracts so as to render itself liable for "impact" damages should it not be possible to adhere strictly to the schedules then in force.

■ We do not believe that the government in any way waived its right to make changes to the contracts by approving the transfer to Quincy. There would have had to have been an express statement to this effect, for us to find that the government was bound to refrain from changing the contract so as to delay construction or, alternatively to absorb the costs to plaintiff of hiring "green labor" to work on the Bethlehem contracts. The government possessed a unilateral right to modify the design of the submarines so as to reflect evolving safety and other technological standards. The approval of the transfer of the submarines did not expressly or even impliedly constitute a waiver of this right. See Carl M. Halvorson, Inc. v. United States, supra. The government simply determined that allowing the transfer would not adversely affect its interest. In no other way, other than to permit the move, were the contractual rights and obligations of the parties altered. Defendant, therefore, is not bound to pay plaintiff any damages arising under the changes clause other than those normally compensable thereunder.

Plaintiff also suggests that the changes in the Groton contract, by necessitating a holdover of the crew intended for the Bethlehem contracts, constituted a constructive change to the latter contracts. Under the facts found by the board, which are substantially supported by evidence in the rec-

ord, we cannot agree with this assessment. The government did not demand that the crew employed on the SSN 614 and 615 be retained to perform all changes until contract completion. The matter of how best to utilize its staff was left up to plaintiff's management. It was solely plaintiff's decision to retain the skilled crew on the Groton contracts and hire green labor for the other contract. This action by plaintiff cannot be construed to be a constructive change to the Bethlehem contracts by the government.

The defendant has paid for all extra work directly caused by the changes it ordered. The pending dispute under the Wunderlich Act is, so far as it is one of law, whether defendant must also pay for work under one contract made more costly by changes ordered in another contract.

There is or has been a tendency on the part of boards to limit equitable adjustments under changes and changed conditions articles to extra work in effecting the change or overcoming the changed condition. We have repeatedly had to correct this when the change has directly led to disruption, extra work, or "new procedures" elsewhere on the job. *Paul Hardeman, Inc. v. United States*, 406 F.2d 1357, 186 Ct.Cl. 743 (1969); *Merritt-Chapman & Scott Corp. v. United States*, 429 F.2d 431, 432, 192 Ct.Cl. 848, 851 (1970); order in *Purvis v. United States*, Ct.Cl., 578 F.2d 1389, (1978). If we should assume hypothetically that the government had contracted for all the submarines here involved under one contract, plaintiff's version of the facts would, if accepted, put it within reach of a favorable legal result.

Where the extra costs result from the "impact" of one contract on another, the situation appears to be different.

In *J. A. Jones Construction Co. v. United States*, 390 F.2d 886, 182 Ct.Cl. 615 (1968), a contractor for the Missile Test Center at Cape Kennedy suffered higher labor costs because other contracts awarded to Jones and other contractors after his first one, provided for overtime labor and practically required plaintiff to pay overtime also, or lose its labor supply. The case went off on a "superior knowledge" theory, the court, however, saying—

* * * [W]e need not elaborate the established rule that, while the defendant had no obligation to prevent (and indeed, was free to precipitate) the avalanche that buried the contractor, it was not free, if it was aware of the impending avalanche and knew that J. A. Jones was not, to stand aside and let the bidder be overwhelmed without a warning. * * [390 F.2d at 888, 182 Ct.Cl. at 619.]

A case cited therein, *United States v. Beuttas*, 324 U.S. 768, 65 S.Ct. 1000, 89 L.Ed. 1354 (1945), sets forth the "established rule" of nonliability in such circumstances and mentions, without adopting, a possibility of government liability for intentionally and knowingly hindering plaintiff or culpably increasing its costs. A footnote in *Jones* also refers to *Amino Brothers Co. v. United States*, 372 F.2d 485, 178 Ct.Cl. 515, *cert. denied*, 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967), in which the Army Engineers were held under the "sovereign act" doctrine not to be liable for release of impounded water which destroyed the flood control work plaintiff was building under contract.

In *Allied Paint Mfg. Co. v. United States*, 470 F.2d 556, 200 Ct.Cl. 313 (1972), plaintiff supplied paint under numerous small orders. Defendant suddenly changed its inspection procedure, without being able at once to perform its new inspection requirements, but it was held entitled to make the change it did. The change impeded plaintiff by disrupting its operations to the extent that paint under 31 orders was not even tendered for inspection. It was held that defendant was entitled to terminate those 31 orders for default.

In *Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 568, 174 Ct.Cl. 153, 175 (1966), it is held that the "impact" of the breach of one contract on costs under another is not compensable unless the adverse effect is "reasonably foreseeable." *See also Ramsey v. United States*, 121 Ct.Cl. 426, 433–34, 101 F.Supp. 353, 357–58 (1951), *cert. denied*, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952), and *Myerle v. United*

*States*, 33 Ct.Cl. 1, 27 (1897), as to general adverse effects of a government breach on the contractor's business not being compensable.

■. The cases seem to lead to the conclusion that only in exceptional circumstances can an equitable adjustment be made for extra cost in performing one contract, caused by the government doing things it has a right to do, respecting other contracts. Such rare cases will be those of concealment from the plaintiff, when it bids, of already formulated plans and intentions respecting other contracts, which plans and intentions the plaintiff needs to know to estimate its costs, possibly some instances of intentionally and knowingly hindering the plaintiff in doing the contract work, and perhaps other instances where some degree of government culpability and "proximate cause" exist. The *J. A. Jones* dictum, quoted above, indicates clearly by necessary inference that there is no general right to equitable adjustment computed by following the cost consequences of changes ordered in one contract, into another. Whatever exceptions there may be, when such following is possible, this case is not among them. The purpose of an equitable adjustment is, after all, to do equity. *Winston Bros. Co. v. United States*, 458 F.2d 49, 198 Ct.Cl. 37 (1972). For such an adjustment to be allowable here, it would be necessary that the government's refusal to make the adjustment is inequitable in some fashion. In view of the amount of responsibility plaintiff's own management choices obviously had in causing the added costs, the refusal is not inequitable here.

In reaching the conclusion we come to the trial judge and the board both relied, apparently as alternative grounds, on para. 16 of the novation agreement entered into when the government consented to General Dynamics taking over the contracts, NObs-4509 and NObs-4583, for SSN 638 and 649. This was a standard clause that the government would not be liable for any costs or expenses, or increases therein, directly or indirectly arising out of or resulting from the transfer. It is certainly true that if there had been no such novation, the transfer of the Groton submarines to Quincy

would not have occurred, so we have a *causa sine qua non*. Whether this constitutes the involved cost as "arising out of or resulting from" the novation is vehemently denied by plaintiff. We see the question as not free from doubt and the answer is not obtainable from the previous reported cases in which the clause is construed. Since we deem the result inevitable on the grounds already stated, it is unnecessary to labor to construe para. 16 to give the result alternative support. We also give plaintiff the benefit of any doubt whether it has released its claim and whether it has been claiming under the right contracts.

So far as the claim is for breach of contract under a "cardinal change" theory, we determine that on the record before us there was no "cardinal change," all changes ordered being within the scope of the contracts. So far as the claim is for relief under the contracts, seeking Wunderlich Act review of the unfavorable board determination, we hold that the said determination must be affirmed since it is not contrary to law, not arbitrary or capricious, and its fact findings have the support of substantial evidence. The plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted, and the petition is dismissed.