3 F.3d 759
 39 Cont.Cas.Fed. (CCH) 76,568
 EXECUTIVE BUSINESS MEDIA, INCORPORATED, Plaintiff-Appellant,
v.
U.S. DEPARTMENT OF DEFENSE, Richard B. Cheney, Secretary;
Defense Commissary Agency, Major General John P.
Dreska, Director; Downey
Communications, Incorporated,
Defendants-Appellees.
 No. 92-2490.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 5, 1993.
Decided Sept. 1, 1993.
 
 Geoffrey Richard Wagner Smith, McDermott, Will & Emery, Washington, DC, argued (Michael D. Friedlander, T. Raymond Williams, Matthew C. Rosser, of counsel), for plaintiff-appellant.
 Michael Scott Raab, Civ. Div., U.S. Dept. of Justice, Washington, DC, argued (Stuart M. Gerson, Asst. Atty. Gen., Richard Cullen, U.S. Atty., John F. Daly, Civ. Div., U.S. Dept. of Justice, Washington, DC, of counsel), for federal defendants-appellees.
 Alan Mark Grayson, Falls Church, VA, argued (C. Sanders McNew, Caplin & Drysdale, Washington, DC, of counsel), for defendants-appellees Downey Communications.
 Before HALL, Circuit Judge, SPROUSE, Senior Circuit Judge, and MICHAEL, District Judge for the Western District of Virginia, sitting by designation.
 OPINION
 SPROUSE, Senior Circuit Judge:
 
 
 1
 Executive Business Media, Inc. (EBM) brought this action against the Defense Commissary Agency (DeCA), Downey Communications, Inc., and others under 5 U.S.C. Sec. 702 seeking injunctive and declaratory relief based on an allegedly unlawful government contract awarded to Downey in a settlement agreement. The district court granted summary judgment against EBM, concluding that the settlement agreement between DeCA and Downey was not subject to judicial review because it was executed by the Department of Justice (DOJ) under the Attorney General's litigation authority and discretion. See 28 U.S.C. Secs. 516, 519. In our view, the district court erred in holding the settlement agreement was not reviewable. We, therefore, reverse and remand.
 
 
 2
 * DeCA, an agency within the Department of Defense (DoD), manages military commissaries throughout the world. One of its functions is to issue publications for its commissaries. In 1983, Congress' Joint Committee on Printing granted DoD a "limited waiver" from printing regulations requiring the Government Printing Office to do all agency printing. The waiver permitted the DoD to award contracts for printing and publishing of civilian enterprise (CE) publications through a competitive bidding process. The waiver required the DoD to promulgate regulations governing CE publications to ensure that it "receive[d] the best possible arrangement for the production of such publications through competitive procedures." See 32 C.F.R. Sec. 247 et seq.
 
 
 3
 In 1991, DeCA decided to accept competitive bids to publish an internal employee newspaper entitled Vision, a bi-monthly with a magazine format containing articles of current interest to be distributed at commissaries worldwide. Both EBM and Downey competed for the Vision contract. The successful bidder would gain profits from advertisements placed in Vision by companies selling to commissaries, military personnel, and civilian employees on military bases.
 
 
 4
 Downey won the contract. Shortly thereafter, a dispute arose between Downey and DeCA over Downey's efforts to solicit advertisers for Vision. Downey had advised potential advertisers that DeCA closely monitored advertisers in Vision, arguably implying that they would receive preferential treatment from DeCA's commissary management by advertising in Vision. Disapproving of these tactics, DeCA refused to approve the final Vision contract.
 
 
 5
 Downey sued DeCA in the United States Court of Claims. By letter dated September 24, 1991, however, Downey offered to dismiss its suit if DeCA would modify the original Vision contract to provide for publication by Downey of a DeCA Guidebook--an annual telephone and fact directory--from 1992-1994, with an option for 1995. The DOJ, representing DeCA in its litigation, accepted Downey's offer, and the parties entered into a settlement agreement effectuating this agreement. EBM then brought this action asking for an injunction and a declaration that the contract was void for, inter alia, failure to comply with competitive bidding procedures.
 
 
 6
 After a preliminary hearing, the district court declined to order injunctive relief. Subsequently, the court granted summary judgment to the defendants, holding that the Attorney General had plenary discretion to settle the Downey litigation under 28 U.S.C. Sec. 516 and Sec. 519 and that the settlement terms, therefore, were not judicially reviewable. Although EBM presented several issues for determination, this was the sole principle of law decided by the district court.
 
 
 7
 We reverse on that principle and remand for the district court to resolve remaining issues in the first instance.
 
 II
 
 8
 We agree that the Attorney General has broad discretion and even plenary authority to control litigation under 28 U.S.C. Secs. 516 and 519, and that such decisions are not judicially reviewable. We disagree, however, with the government's assertion that this authority empowers the Attorney General to engage in or authorize unlawful acts. Section 516 provides:
 
 
 9
 Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.
 
 Section 519 provides:
 
 10
 Except as otherwise authorized by law, the Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties.
 
 
 11
 In addition, Section 5 of Executive Order No. 6166 (June 10, 1933), reprinted in 5 U.S.C. Sec. 901 note, provides in part:
 
 
 12
 As to any case referred to the Department of Justice for prosecution or defense in the courts, the function of decision whether and in what manner to prosecute, or to defend, or to compromise, or to appeal, or to abandon prosecution or defense, now exercised by any agency or officer, is transferred to the Department of Justice.
 
 
 13
 The government cites a host of cases holding that the Attorney General's statutory and executive authority is plenary. See, e.g., Confiscation Cases, 74 U.S. (7 Wall.) 454, 458-59, 19 L.Ed. 196 (1868); United States v. Newport News Shipbuilding & Dry Dock Co., 571 F.2d 1283, 1286-87 (4th Cir.), cert. denied, 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978). We have no quarrel with that conclusion from our cases. We are of the view, however, that plenary power means absolute authority to pursue legitimate objectives and does not include license to agree to settlement terms that would violate the civil laws governing the agency. Even the government concedes that the Attorney General's settlement is not "boundless" and can be diminished by "a clear and unambiguous directive from Congress." United States v. Hercules, Inc., 961 F.2d 796, 798 (8th Cir.1992). Short of that, it argues that the Attorney General in settling or otherwise conducting litigation is free to violate laws governing agency conduct. In our view, however, the Attorney General in representing a government agency is bound by the same laws that control the agency.
 
 
 14
 The government cites the DOJ Office of Legal Counsel's opinion discussing the interplay between Article II, Sec. 3 of the Constitution (executive's duty to "take Care that the Laws be faithfully executed") and the Attorney General's plenary settlement authority, stating that
 
 
 15
 it is reasonably clear that the Attorney General--in the exercise of his settlement responsibilities--is not bound by each and every statutory limitation and procedural requirement that Congress may have specifically imposed upon some other agency head in the administration of that agency's programs.
 
 
 16
 Settlement Authority of the United States in Oil Shale Cases, 4B Op.Off.Legal Counsel 756, 758 (1980). In our view, the Office of Legal Counsel's opinion, at least as characterized by the DOJ, misconstrues and overstates the Attorney General's power. We think it alien to our concept of law to allow the chief legal officer of the country to violate its laws under the cover of settling litigation. The Attorney General's authority to settle litigation for its government clients stops at the walls of illegality.[1]
 
 
 17
 We have considered, of course, the analogous issue of the scope of an agency's plenary power in the narrow area where it has unbounded discretion. In Garcia v. Neagle, 660 F.2d 983 (4th Cir.1981), cert. denied, 454 U.S. 1153, 102 S.Ct. 1023, 71 L.Ed.2d 309 (1982), we said:
 
 
 18
 In general, even where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations. As the District of Columbia Circuit has observed, "[w]hen the bounds of discretion give way to the stricter boundaries of law, administrative discretion gives way to judicial review."
 
 
 19
 Id. at 988 (quoting Scanwell Lab., Inc. v. Shaffer, 424 F.2d 859, 874 (D.C.Cir.1970)) (citations omitted); see also Electricities of North Carolina, Inc. v. Southeastern Power Admin., 774 F.2d 1262, 1267 (4th Cir.1985); Guadamuz v. Bowen, 859 F.2d 762, 767-68 (9th Cir.1988). We think this same rationale limits the otherwise plenary authority of the Attorney General to control agency litigation.
 
 
 20
 The DoD regulations governing CE publications were promulgated pursuant to a waiver issued by the Joint Committee on Printing pursuant to 44 U.S.C. Secs. 103 and 501.[2] The waiver required the DoD to promulgate regulations providing "for the production of [CE] publications through competitive procedures." In accordance with this waiver requirement, the DoD's CE regulations provide:
 
 
 21
 1. ... The underlying premise of the CE concept is that DoD Components and their subordinate command will save money by transferring certain publishing and distribution burdens to a private sector publisher selected by competitive bid.
 
 
 22
 ....
 
 
 23
 3. A written contract with the selected commercial publisher shall be established by the commander for each CE publication.
 
 
 24
 4. ... If there is only one bidder, [DoD] may decide that the offer [is] not sufficient to warrant producing the publication and make no selection....
 
 
 25
 5. ... In selecting a publisher, fair and equal opportunity shall be afforded any responsible, qualified bidder who may wish to submit a proposal to publish the CE publication.
 
 
 26
 32 C.F.R. Sec. 247, App. B, F (emphasis added). We do not believe that the Attorney General is empowered to circumvent these regulations, which have the force and effect of law and implement a congressional directive that government contracts be procured by competitive bidding.
 
 III
 
 27
 The government and Downey contend, alternatively, that even if the Attorney General must observe agency regulations to accomplish governmental objectives, the Attorney General did not violate the Joint Committee directive and DoD regulations here. They argue that the government has authority under the "cardinal change doctrine" to modify a competitively-bid contract. Both parties acknowledge that this doctrine permits "deductive" modifications to a contract--i.e., changes within the general scope of the contract. However, if proposed modifications go beyond the scope of the contract, the government cannot effect them unilaterally but must submit the changed contract to competitive bidding.[3]
 
 
 28
 EBM argues the changes made in the settlement agreement were cardinal changes requiring DeCA to submit the DeCA Guidebook contract to competitive bidding. At the outset, it notes that the DeCA Guidebook and Vision magazine fall into different definitional categories in the CE guidelines. The DeCA Guidebook (a "guide" or "directory") is a "publication[ ] that provide[s] DoD personnel information about the mission of their command; the availability of command; installation or community services; local geography; historical background; and other information." 32 C.F.R. Sec. 247.3(a)(1). By contrast, Vision magazine (a "DoD newspaper") contains "commanders' comments, letter-to-the-editor columns, news, features, editorials, sports, announcements, entertainment items, photography, and artwork." 32 C.F.R. Sec. 247.3(b). EBM notes that besides their differences in definition and content, the publications differ in length, frequency of publication, advertising appeal and revenue, costs of production and distribution, and profit margin. It contends that these differences are critical. Vision contains primarily editorial and news events; the DeCA Guidebook is a telephone and fact directory. Vision is only 28 pages, is printed bi-monthly or monthly, is generally not retained by the users, and generates costs throughout the year. The DeCA Guidebook, by contrast, is 240 pages long, is printed only annually, and is used as a reference guide throughout the year. While the Vision contract term is one year, the contract term for the Guidebook is three years. And, while Vision requires support from DoD personnel, including computer support, art direction, color printing, and production, the Guidebook does not.
 
 
 29
 By contrast, the government and Downey urge that the modification to the contract was merely a deductive change within the general scope of the Vision contract. They maintain that the modification effected by the settlement agreement provided for essentially the same work as bargained for in the original contract. They stress that both versions of the contract provided for the printing and distribution of a CE publication that disseminates information to DeCA employees, that the same general regulatory requirements pertain to both publications, and that the contents of the two publications are similar. They concede that the settlement agreement changed the publication schedule from six bi-monthly issues to three annual issues, but maintain that the modifications did not change the basic features of the original Vision contract. It retained the "magazine" style format, color, and typeface requirements. They also contend that the responsibility of both Downey and DeCA under the contract remain essentially the same.
 
 
 30
 The issue, in our view, is whether the awarding of the contract that resulted from the settlement agreement violated the DoD's mandatory competitive bidding procedures. The parties both couch this issue within the framework of the cardinal change doctrine. This may be a helpful approach, and on remand the district court may consider those principles as they relate to whether the government has circumvented the competitive procurement process. See, e.g., Cray Research, Inc. v. Department of Navy, 556 F.Supp. 201, 203 (D.D.C.1983); In re Memorex Corp., 61 Comp.Gen. 42, 81-2 CPD p 334 (1981); In re American Air Filter Co., 57 Comp.Gen. 567, 78-1 CPD p 443 (1978). In any event, the district court should determine if the contract to publish the DeCA Guidebook is sufficiently different from the original Vision contract to require a separate competitive bidding procedure. Our review of the descriptions of the two publications convinces us that the issue of whether one or two contracts are involved should be resolved initially by a fact finder.
 
 
 31
 EBM has asserted numerous other violations in connection with the DeCA Guidebook contract. It alleges violations of the Armed Services Procurement Act, 10 U.S.C. Sec. 2301 et seq., the Federal Acquisition Regulation, 48 C.F.R., Ch. 1, and the Anti-Deficiency Act, 31 U.S.C. Sec. 1341. We have reviewed the record and considered the parties' arguments and find these claims without merit.
 
 
 32
 We, therefore, remand to the district court to determine whether the DoD's CE regulations have been violated and to resolve any other issues that its initial findings might require.[4]
 
 
 33
 REVERSED AND REMANDED.
 
 
 
 [1]
 Both parties cite cases holding that the Attorney General's litigation decisions supersede an agency's decisions. See, e.g., United States v. Newport News Shipbuilding & Dry Dock Co., 571 F.2d 1283 (4th Cir.), cert. denied, 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978). We believe that all Newport News stands for is the proposition that when the Attorney General represents an agency in litigation, it is the Attorney General, rather than the agency, who has the final authority to determine the litigation position of the United States
 
 
 [2]
 Section 103 provides that
 The Joint Committee on Printing may use any measures it considers necessary to remedy neglect, delay, duplication, or waste in the public printing and binding and the distribution of Government publications.
 Section 501 states that
 All printing, binding, and blank-book work for Congress, the Executive Office, the Judiciary, other than the Supreme Court of the United States, and every executive department, independent office and establishment of the Government, shall be done at the Government Printing Office, except--
 (1) classes of work the Joint Committee on Printing considers to be urgent or necessary to have done elsewhere; and
 (2) printing in field printing plants operated by an executive department, independent office or establishment, and the procurement of printing by an executive department, independent office or establishment from allotments for contract field printing, if approved by the Joint Committee on Printing.
 
 
 [3]
 The "cardinal change" doctrine originally developed in government contract law to determine whether the government had breached a contract by imposing unilateral changes on a contractor outside the contract's scope. See Atlantic Dry Dock Corp. v. United States, 773 F.Supp. 335, 339 (M.D.Fla.1991); General Dynamics Corp. v. United States, 585 F.2d 457, 462, 218 Ct.Cl. 40 (1978); Edward R. Marden Corp. v. United States, 442 F.2d 364, 369, 194 Ct.Cl. 799 (1971). It was based on the terms of the Changes Clause in government contracts, 48 C.F.R. Sec. 52.243-1(a) ("The Contracting Officer may ... make changes within the general scope of this contract."). Under the original formulation of the doctrine, courts have held that a cardinal change occurs when the government alters contract work so drastically "that it effectively requires the contractor to perform duties materially different from those originally bargained for." General Dynamics, 585 F.2d at 462; see also Universal Contracting & Brick Pointing Co. v. United States, 19 Cl.Ct. 785, 791 (1990). A cardinal change is "outside the scope of the contract itself." In re Boston Shipyard Corp., 886 F.2d 451, 456 (1st Cir.1989)
 More recently, the cardinal change doctrine has been applied to "prevent[ ] government agencies from circumventing the competitive procurement process by adopting drastic modifications beyond the original scope of a contract." Cray Research, Inc. v. Department of Navy, 556 F.Supp. 201, 203 (D.D.C.1983). See In re Memorex Corp., 61 Comp.Gen. 42, 81-2 CPD p 334 (1981); In re American Air Filter Co., 57 Comp.Gen. 567, 78-1 CPD p 443 (1978). The standard applied in this situation is "whether the modified contract calls for essentially the same performance as that required by the contract when originally awarded so that the modification does not materially change the field of competition." Cray Research, 556 F.Supp. at 203 (citations omitted).
 
 
 [4]
 Depending on the district court's resolution of whether the government violated the applicable competitive bidding process, it may need to resolve other issues raised, including any relating to a remedy