**RALPH L. JONES COMPANY, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 93–711 C.

United States Court of Federal Claims.

May 1, 1995.

Fred E. Stoops, Sr., Tulsa, OK, for plaintiff.

Elizabeth A. Rinaldo, U.S. Dept. of Justice, Washington, DC, for defendant.

## OPINION

HODGES, Judge.

Plaintiff seeks an equitable adjustment of $345,794.65 for extra work performed under a fixed-fee construction management agreement with the United States Department of Housing and Urban Development. Defendant argues that the scope of work related to the construction management agreement was not increased, and if it were, plaintiff cannot show additional costs incurred which would merit an adjustment. We find that the fixed fee should be increased by $30,965.

## FACTS

HUD undertook an effort in early 1990 to provide better living conditions in four housing complexes in Tulsa, Oklahoma, that were in various states of disrepair. Ralph L. Jones Company (RLJ),[1] a real estate firm that provides construction and management services, entered a temporary emergency contract with HUD in January to stabilize the complexes and to perform minor repairs. HUD decided in the months afterward to undertake a greater rehabilitation effort and negotiated a cost-plus-percentage-of-cost contract with RLJ to meet these goals. It later realized this type of contract would be illegal. See 41 U.S.C. § 254. A cost-plus-fixed-fee contract was chosen as the vehicle for the project. The scope was roughly defined as "safe, decent, and sanitary." HUD directed RLJ to renovate four apartment units representing the general spectrum of repairs to serve as a basis for the scope and cost of the renovation effort. The average cost of the repairs for each unit was $4200.

HUD issued a request for proposals for a full-service project management contract. Plaintiff responded with a bid on the contract, including cost and pricing data stating that the contractor would be "paid a renovation and construction management fee of $465.00 per unit based on a total of 720 units, or $334,800." Plaintiff added:

Unit prices [are] based on an 11.07% average mark-up. Of this, the cost elements to be paid by [plaintiff] will be overhead of 7% for direct cost of salaries for management, supervision and cost control personnel, together with payroll burden, insurance, taxes, vehicle reimbursement for construction manager and profit of 4.07%.

HUD and RLJ agreed to a full-service management contract on June 15 consisting of a cost-reimbursement contract for the rehabilitation effort and a fixed fee for management of the apartments. The construction management fee was not included in the agreement.

In July, RLJ submitted invoices for payment of the construction management fee, but the payments were denied because there was no corresponding provision in the contract. The parties negotiated for the fee in the following weeks, and on August 24 they entered a modification to add the construction management fee. Defendant asserts that plaintiff had knowledge of site conditions and HUD intentions to increase the scope of the renovation effort at that time. Therefore, the fixed fee contemplated the extra work. Plaintiff argues that the modification simply corrected clerical errors and was based on the original scope of the contract.

HUD Project Manager Roy Gardner[2] and other HUD officials assured Jones that RLJ would be compensated for any extra management costs. Jones attempted to have the fee increased in November 1991 because the renovation had more than doubled in cost. He suggested that the administrative supervision required had increased at the same rate and should be compensated proportionally. Con-

---

1. Ralph L. Jones, the president of RLJ, is referred to in this opinion as Mr. Jones.

2. Mr. Gardner died in June 1992.

tracting Officer Ken Beck asked for more specific information to justify the increase. In particular, the contractor was directed to "define *in detail* the cost incurred due to the changed conditions. A full cost analysis is required. Give actual performance dates, dates of delays and disruptions."

Jones filed a claim with the Contracting Officer in December 1991. That claim included a breakdown of changes, their costs, and a value for the adjustment to the management fee.[3] The adjustment was calculated as a percentage of the cost of the renovation changes equal to the percentage used in the initial cost proposal.

RLJ submitted additional cost information at HUD's request in September 1992.[4] It estimated the hours required for supervision and administration for each change because actual hours and costs were not available. Jones asserted that percentage of costs was the original basis for compensation and should continue to play some role in the equitable adjustment.

HUD's Oklahoma City Office took control of the contract in the fall of 1992 and requested more information. It could not "find any specific documentation or records supporting [plaintiff's] claimed costs." The new Contracting Officer, Ernest Worsham, issued a final decision denying the claim in December 1992. He determined that plaintiff had not notified HUD of changes to the contract until the claim was filed and that he could not confirm that any of the estimated costs were allowable or allocable to the contract. The CO denied the claim because there was no showing that changes to the renovation management contract had been made.

There is no doubt that the scope of the renovations was expanded during the term of the contract by HUD's addition of certain improvements. Plaintiff has been reimbursed for all construction efforts and materials related to the renovations. Plaintiff claims that it should receive an additional $345,794 on its construction management fixed fee because of the greater management responsibilities caused by the increased rehabilitation effort. The management fee was based on a percentage of cost of the original scope of the rehabilitation. Plaintiff seeks a fee adjustment equal to that same percentage of the extra costs of the rehabilitation.

### DISCUSSION

■ The ultimate goal of an equitable adjustment is to do equity. *General Dynamics Corp. v. United States*, 218 Ct.Cl. 40, 56, 585 F.2d 457 (1978). However, the government contractor seeking an equitable adjustment bears the burden of proving liability, causation, and resultant injury. *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 199, 351 F.2d 956 (1965); *Electronic & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 253, 416 F.2d 1345 (1969). It must show that the increased costs arose from work which was materially different from that contemplated by the parties. *Mojave Enterprises v. United States*, 3 Cl.Ct. 353, 357 (1983); *Miller Elevator Co., Inc. v. United States*, 30 Fed.Cl. 662, 678 (1994).[5]

---

3. The categories of repairs for which RLJ sought an adjustment were plumbing repair, electrical repair, addition of air conditioning, window replacement, structural roof repair, structural foundation repair, building a storage building, installation of mapes panels, drainage control, creating a picnic area, heating repair, asbestos removal, removal of contaminated soil, and installation of vinyl siding. The total amount of the adjustment to the fixed fee was $345,794.65.

4. The September 1992 proposal included additional items not set forth in the 1991 claim: individual metering, meter cages, underground sewer problems, addition of a guard shack, dumpster pads, handicapped accessibility, storage buildings, landscaping, conversion of the community center, asphalt repair, and privacy fences. Jones testified that many of these catego-

ries are simply more specific breakdowns of its earlier claim.

5. An equitable adjustment is determined by whether the work was foreseeable based on the information before the contractor at the time of the contract. *See Johns–Manville v. United States*, 12 Cl.Ct. 1, 33 (1987); *Sterling Millwrights v. United States*, 26 Cl.Ct. 49, 72 (1992); *Mojave Enterprises*, 3 Cl.Ct. at 357. "Foreseeability" in this instance refers to work that reasonably could be anticipated based on the contemplation of the parties. The question is whether the work would be a foreseeable consequence of those matters the parties "consider[ed] with continued attention," regarded thoughtfully, or "view[ed] ... as probable or as an ... intention." *See* Webster's New International Dictionary, 2d ed. 574 (1955). Foreseeability in this

The increased costs must be the direct and necessary result of the changes. *Johns–Manville v. United States,* 12 Cl.Ct. 1, 33 (1987) (citations omitted).

HUD was pleased with RLJ's performance and interest in the humanitarian aspects of the contract, but plaintiff's quality of performance is not at issue. Our inquiry is whether the scope of the work on which the construction management fee was based changed and whether plaintiff can prove that those changes increased its management costs. The agreement between HUD and RLJ, including the modification, clearly was intended to be a cost-plus-fixed-fee contract.

> A cost-plus-fixed-fee contract is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract. The fixed fee does not vary with actual cost, but may be adjusted as a result of changes in the work to be performed under the contract.

48 C.F.R. § 16.306(a) (1994). *Allison Division, General Motors Corporation,* ASBCA No. 15528, 72–1 B.C.A. ¶ 9343 at 43,383. The Contracting Officer is obligated to make an equitable adjustment in the contract price when Government changes increase the cost of performance. FAR 52.243–1 (1994).

■ In architect and engineering cost-plus-fixed-fee contracts, the contractor receives a fixed fee to design a project and costs for the construction effort. The fixed fee usually is based on a percentage of the estimated cost of the construction project. Thus, the work required is closely related to the estimated cost of the contract. *See H.K. Ferguson Company,* ASBCA No. 2826, 57–1 B.C.A. ¶ 1293 at 4027, 1957 WL 4959 (1957). However, an increase in the cost of construction does not per se justify an increase in the contractor's fixed fee. *General Dynamics,* 218 Ct.Cl. at 56, 585 F.2d 457 (increase of $100 million to $60 million contract did not justify increase in fixed fee); *Schoenfeld Associates, Inc.,* VABCA No. 2104, 87–1 B.C.A. ¶ 19,648 at 99,477, 1987 WL 46578. "Adding a fee ... for unexpected costs is not only logically contrary to the '*fixed* fee' notion, it is also illegal by reason of the statutory prohibition against cost-plus-a-percentage-of-cost contracting." *Salisbury & Dietz, Inc.,* IBCA No. 2090, 87–3 B.C.A. ¶ 20,107 at 101,-822, 1987 WL 41281. A change in the fee is proper only for work not contemplated at the time the fee was negotiated, "not merely because greater than expected costs were being encountered doing the work as originally contemplated." *Salisbury & Dietz, Inc.,* 87–3 B.C.A. at 101,822.

Major changes to the original scope of the cost-reimbursable renovation contract were made at the direction of authorized Government officials, but plaintiff cannot recover solely because of these changes. The amount of the adjustment for a change in the work "is a matter of negotiation and not a matter of right based on a percentage formula used to determine the fee in the basic contract." *Salisbury & Dietz, Inc.,* 87–3 B.C.A. at 101,822. We must decide (1) the intended scope of the renovation and management effort when the $465 fee was agreed upon; (2) whether the extra work plaintiff claims is outside the scope of the management effort on which the $465 per unit fee was based; and (3) whether plaintiff can support its costs for extra management effort.

## I. WHAT WAS INCLUDED IN THE FIXED FEE?

■ The original scope of the renovation work was determined by the four model units, which generally represented the spectrum of repairs needed. The estimated total cost was $4.2 million, but the contractor knew that the full-scale rehabilitation project would require more repairs than experienced in the test units. The final cost of the contract was over $9 million. The contractor argues that this enormous increase occurred because HUD changed the renovation standard from "safe, decent, and sanitary" to "marketable." While it is clear that areas of repair not experienced in the model units were part of the renovation effort, plaintiff cannot recover solely because these changes occurred and the total cost of the project increased. Plaintiff's recovery is determined

context is consistent with the negotiated nature

of the management fee.

by the amount of work on which the management fee was based.

The fee was not included in the contract until the August 24 modification. Jones contends that the addition of the fee in the August modification merely corrected clerical errors in the original contract. Defendant characterizes it as a separate contract. Plaintiff's interpretation would include only that work reasonably expected after completing the four test units. A fee set at the later date would include work foreseeable after June 15.

The purpose of the fixed fee was to provide compensation and a profit to the contractor for supervising the renovation effort. The contractor's bid proposal included a $465 per unit fee and explained:

> All units will be renovated to the approved HUD standard as determined by the local HUD office, the GTR, the Tenant Association and management. Payment will be made by HUD ... based on the unit price, for all approved units. It is understood that a large percentage of units are in a state of complete disrepair and will require total demolition and complete renovation to include new windows, doors (exterior and interior), ceilings, walls, plumbing fixtures, cabinets ... heating and hot water equipment. Other units will require partial demolition and renovation, while others will require even less demolition but partial renovation of at least part of the above list.

Characterizing the omission of the fee in the June contract as an oversight however, is contradicted by the language of the August modification. It states, "The purpose of this modification is to include an administrative fee of $465.00 per completed and accepted rehabed apartment, and to make clerical corrections." We find that the scope of work for the fee was not set until the modification was entered.

The scope of the work for the fee therefore includes more than that performed or reasonably foreseeable from the work on the test units. Jones, Beck, and Gardner subsequently participated in discussions regarding the inclusion of a fee. A memorandum from

the CO to Gardner dated July 23 stated that "the scope and magnitude of the construction work has evolved into a level far beyond that originally described or anticipated." The CO noted the terrible condition of many apartments and specifically cited plumbing and asbestos—"the impact of which is not fully known." He wrote:

> Because the aforementioned additional workload must be borne by the property manager [RLJ] and since the scope of the job has been dramatically increased, it is unreasonable to expect such additional work without additional compensation.

> \* . \* \* \* \* \*

> ... [A] fee of $485 per completed unit is justified. This calculates to 12%—the industry average for such services is 15% and above.[6]

On July 25, Jones provided construction cost information at HUD's request and insisted that the construction management fee be approved. He stated in an August revised pricing proposal: "I want to re-emphasize that, while we did agree to $465/unit and will stand by that figure, experience to date indicates this to be conservative.... We have attacked the very worst cases first and feel that the work load will adjust to more closely approach $465/unit." RLJ was aware of the risk of the increased cost of the renovation efforts.

Plaintiff asserts that Gardner encouraged RLJ to agree to the $465 fee with the promise that cost overruns caused by increased work would be remedied at the end of performance. At the time, there was pressure from federal, state and local leaders who demanded quick results and pressed for more improvements. Whether Jones was only justifying his original fee in reliance on Gardner's word does not alter the finding that the fee includes all work reasonably foreseeable at the time the modification was entered. RLJ was not forced to perform this contract. It signed on willingly and we can only conclude that RLJ acted in its own best interests. Jones pressed HUD to approve the fee at $465 to protect his company; he

---

**6.** The $485 figure should have been $465 according to Jones and Beck. RLJ mistakenly gave the number in its request for payment and Beck used that number.

could have bargained for a larger fee to cover any new problems or changing demands and their foreseeable consequences. The basis of the fixed fee must be all work that reasonably was foreseeable at the time of the August modification.

## II. CHANGES TO THE MANAGEMENT EFFORT

■■■ There is no set formula for determining whether work is outside the scope of the contract. "Each case must be analyzed on its own facts and circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole." *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 194, 351 F.2d 956 (1965); *Edward R. Marden Corp. v. United States*, 194 Ct.Cl. 799, 808, 442 F.2d 364 (1971); *General Dynamics*, 218 Ct.Cl. at 49, 585 F.2d 457. *See Miller Elevator Co.*, 30 Fed.Cl. at 677 (equitable adjustment depends on totality of circumstances). Generally, an equitable adjustment is justified by a change contrary to, or materially different from, the nature of the work contemplated by the parties to the contract. *Miller Elevator Co.*, 30 Fed.Cl. at 677, 678.

The scope of this contract was to repair existing apartment complex structures and make the area livable. The scope did not allow HUD to require the contractor to perform any and all construction work it desired without an adjustment to the fixed fee. That is not to say the scope was narrow; almost any work which could be considered rehabilitation, replacement, renovation, or restoration of an existing structure could be included. Many units were in complete disrepair and some were boarded-up. Many problems could be expected, but no one knew what they would be. This made the scope of work difficult to define at the outset. Thus, the four test units served only as a basis for estimating the general scope of the project. Constructive changes to the contract must be viewed in this context.

### A. Air Conditioning

■■■ The installation of air conditioning was one of the more expensive aspects of the project because of its many consequential effects. The work was not within the scope of the contract as contemplated by the parties. RLJ's fee should be adjusted for this work.

Defendant argues that installing air conditioning at the Vernon Manor and Morningstar complexes was foreseeable at the time the August modification was entered. A July 19 letter from Gardner asked RLJ to submit before August 1 "recommendations regarding installation of air conditioning at the subject property." RLJ insists that the letter did not provide sufficient notice that air conditioning was to be installed. He had no definite indication that this work would be done until later. It was one of many projects that had been discussed but never as more than a possibility. Air conditioning did not exist in these complexes and was not installed or intended to be included in the four model units. RLJ believed that installing air conditioning would not be consistent with HUD's original intent to make the units only "safe, decent, and sanitary."

The decision to install air conditioning was made well after the modification. HUD officials had discussed the subject in August as a possibility but did not recommend installation until September. Gardner instructed RLJ to bid installation of air conditioning in the Vernon Manor complex in September. RLJ quickly responded that the air conditioning changed the scope of the contract and would increase costs by more than one million dollars because it would invoke additional city codes requiring upgrades of electrical, plumbing, and mechanical systems. In a 1992 memorandum, Gardner distinguished the installation of air conditioning as the only change made "after the fact."

Installing air conditioning also is inconsistent with other work expected under the contract. The renovation work was geared toward fixing existing problems in the units; installing air conditioning called for developing a new system rather than the replacing or rehabilitating existing ones. RLJ informed HUD promptly that this work went beyond the nature of work being performed.

■■■ Furthermore, the air conditioning work imposed extraordinary cost increases in

construction. The cost of a changed item may be a factor in determining an equitable adjustment. *Air–A–Plane Corp. v. United States*, 187 Ct.Cl. 269, 283, 408 F.2d 1030 (1969). Cost serves as additional evidence that the air conditioning work was a material change to the contract.[7]

Accordingly, discussions in August about proposals for making such a substantial change would not have been a sound basis for the management fee. The uncertainty of such a substantial change would have made its inclusion in the basis for the management fee in August an unreasonable demand. Thus, we allow an adjustment of the management fee for the extra efforts associated with the installation of air conditioning and the consequential problems it created.[8]

### B. Asbestos Removal

 Asbestos removal was not a change outside the scope of the contract. The parties were aware before August that the impact of asbestos could be major. Beck's July 23 letter cited the "additional complication in the form of asbestos of which the full impact was not yet known." The negotiation memorandum noted the asbestos problem. Jones admits that he was aware of asbestos problems in these old complexes, but contends that neither side believed that the removal would require the extraordinary effort which took place.

RLJ had never done such work before this project and could not be considered an experienced asbestos remover, but this does not mean that RLJ could not recognize the problems that it would face with this work. Plaintiff is an experienced real estate and construction firm; its relative inexperience in asbestos removal probably should have made it more wary of the impact of this variable. At the least, asbestos removal would have been within RLJ's "safe, decent, and sanitary" understanding of the project. At the time of the August modification, asbestos removal as part of the existing renovation effort was reasonably foreseeable. This was a risk that RLJ could have protected against during negotiations for the fixed fee.

### C. Other Problems

 The remaining extras are not materially different from the work contemplated by the contract. Most have common characteristics, so each is not addressed specifically. For example, window repair was much more difficult than expected. The contractor was surprised that panes behind the boarded windows were broken and required complete replacement of the casements. The plumbing in many apartments caused problems that may not have been specifically anticipated at the outset. The foundations and roofs in other apartments required work that was not encountered in the original four units. Electrical, heating, sewer, and asphalt repairs were needed. These are not outside the scope of the work expected. They reasonably fall within a "safe, decent, and sanitary" standard.[9]

---

7. Other evidence in support of our finding may be found in a memorandum from Beck through Gardner to a HUD attorney. The memorandum was produced from plaintiff's own files and allegedly was given to Jones by Gardner. Defendant claimed that the document was protected by the attorney-client privilege and as attorney work-product. We have no reason to believe that Jones received this document in any manner other than by voluntary production from HUD. Thus, an attorney-client privilege would not apply. Also, it may not be work-product. It was created by a contracting officer, not by an attorney. It reflects the contracting officer's views and does not reveal the attorney's mental impressions. It is unlikely that this document was prepared in anticipation of litigation, but to settle the equitable adjustment claim before the contracting officer. The document merely summarizes the CO's factual conclusions. If it were considered to be work-product, we may disclose this type of non-attorney information where the opposing party has a substantial need and would not be able to retain the substantial equivalent without undue hardship. Rule 26(b)(3).

8. Asbestos removal was not part of these consequential problems. Plaintiff attempted to prove that asbestos problems arose because of the implementation of an energy savings program required after the installation of air conditioning. Asbestos problems were evident before that time and the removal effort was caused by other factors within the scope of the contract.

9. Plaintiff also added other features, such as a guard shack, vinyl siding, picnic areas, privacy fences, and handicapped accessibility. Plaintiff did not prove at trial that these efforts were materially different from that expected in the renovation effort. The first three listed are reasonably within the "safe, decent, and sanitary" scope of the contract. Plaintiff did not prove

RLJ did incur such problems more frequently and at greater expense than it expected, but they fall within the general scope of plaintiff's agreement to renovate the apartments. That plaintiff was unaware of some types of problems when it entered the contract does not merit an adjustment. No one represented the condition of these units differently. At the outset, RLJ believed that a large percentage of the units were in complete disrepair and that the boarded units would be the worst. A reasonable investigation would have discovered most of the problems. An experienced contractor could not be surprised to find that extensive repairs were needed in these circumstances. Plaintiff's bid documents acknowledged its awareness of numerous problems. For the complete renovation of a poorly maintained, boarded-up, and abandoned apartment complex, the repairs do not seem unusual or unreasonable.

### III. DAMAGES

It would be illogical to conclude that the cost of renovation and its management were not related in some manner. *See H.K. Ferguson Company,* ASBCA No. 2826, 57–1 B.C.A. ¶ 1293 at 4027, 1957 WL 4959 (1957). As the amount of work increased outside the scope of the intended renovation effort, additional administrative oversight was necessary. However, an increase in the management fee cannot be based solely on the percentage of increased costs. Defendant contends that plaintiff has not proved damages. We agree that the contractor bears the burden of proof in this case, and actual costs are the preferred evidence of damages. However, the contractor is entitled to an adjustment in this situation, and the evidence presented at trial supports recovery.

A contractor seeking an equitable adjustment "need not prove his damages with absolute certainty or mathematical exactitude." *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956 (1965), citing *Dale Construction Co. v. United States,* 168 Ct.Cl. 692, 1964 WL 8611 (1964). *See Daly Construction v. Garrett,* 5

that the privacy fences were different from that contemplated by the parties. Handicapped ac-

F.3d 520, 522 (Fed.Cir.1993). Where the "responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." *Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 257, 416 F.2d 1345 (1969) (emphasis omitted); *S.W. Electronics & Manufacturing Corp. v. United States,* 228 Ct.Cl. 333, 351, 655 F.2d 1078 (1981). It is enough that the contractor supply the court with a "reasonable basis for computation, even though the result is only approximate." *Wunderlich,* 173 Ct.Cl. at 199, 351 F.2d 956 (citations omitted). The court needs only enough evidence to make a fair and reasonable estimate. *Miller Elevator Co., Inc. v. United States,* 30 Fed.Cl. 662, 702 (1994); *Electronic & Missile Facilities,* 189 Ct.Cl. at 257, 416 F.2d 1345.

Damages may be determined using the total cost method when the nature of the added work is difficult to determine; i.e., it is impossible or impractical to separate extra costs from costs caused by changes to the contract. *Miller Elevator,* 30 Fed.Cl. at 705. By this method, the court calculates the difference in the amount of anticipated costs and the actual cost of performance plus profit. This may be appropriate where the contractor proves that all of the increased costs were caused by the Government. *WRB Corporation v. United States,* 183 Ct.Cl. 409, 1968 WL 9146 (1968).

Plaintiff may recover based on a reasonable amount of damages according to the jury verdict method. *Miller Elevator,* 30 Fed.Cl. at 705, citing *River Constr. Corp. v. United States,* 159 Ct.Cl. 254, 271, 1962 WL 9302 (1962) and *Delco Elecs. Corp. v. United States,* 17 Cl.Ct. 302, 324 (1989), aff'd, 909 F.2d 1495 (Fed.Cir.1990). *See, e.g., Shoenfeld Associates, Inc.,* VABCA No. 2104, 87–1 B.C.A. ¶ 19,648, 1987 WL 46578.

The Tulsa HUD Office was as confused as RLJ about the fixed fee. Both HUD and Jones based the management fee on a percentage of the expected contract cost. This is not inconsistent with the manner that many cost-plus-fixed-fee contracts are negoti-

cessibility was ordered before the modification was entered.

ated. Establishing the fixed fee as a percentage of cost is common when no means exist to assign hours to the work. A violation of the cost-plus-percentage-of-cost contract prohibition would only occur in this context if the fixed fee were later adjusted on a percentage basis without finding a connection between the costs and the extra efforts. Plaintiff's equitable adjustment request equals the original fee percentage, applied to the costs exceeding the $4.2 million estimate. When HUD decided that the fixed fee must be justified by actual costs of management effort, the parties simply worked backwards from the fee to assign estimated hours and costs. This does not mean that plaintiff cannot show a relationship between the costs and effort.

 Jones claims that the administrative fee should be adjusted by $30,965 for the installation of air conditioning in the Morningstar and Vernon Manor complexes. He arrived at this number by using a 120–day delay at each site and extra construction costs of $129,480 and $147,000 respectively. RLJ later justified the adjustment by estimating the hours for purchasing and field supervision as well as his own time spent on the change. The figures were computed with the help of an architect and engineering firm. An adjustment of the fee could be justified on estimates of actual costs alone. *Miller Elevator*, 30 Fed.Cl. at 706 (court allowed equitable adjustment based on estimate of additional labor hours). The experts did not testify at trial but the numbers presented were not substantially refuted.

The nature of the work on this project made it difficult for RLJ to segregate its costs. Changes occurred regularly, and HUD knew it would be difficult for RLJ to provide more definite support for its costs. HUD ordered this change and created all the associated extra costs. The amount requested by RLJ is not unreasonable in light of the extraordinary increase in effort that this change created. The original Contracting Officer indicated that he would have adjusted the fixed fee by the full amount of $30,965.

For the reasons stated earlier, the fee may not be adjusted for the other reasons claimed by RLJ. Plaintiff has not shown that those matters amounted to changes outside the scope of the contract.

### CONCLUSION

Plaintiff is entitled to an equitable adjustment of $30,965 for Government-directed changes. The Clerk will enter judgment for plaintiff in that amount. No costs.

