**FERGUSON PROPELLER,
INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–718C.

United States Court of Federal Claims.

Aug. 26, 2003.

Marc F. Efron, Washington, DC, for plaintiff.

Marian E. Sullivan, U.S. Department of Justice, Washington, DC, with whom were Peter D. Keisler, Assistant Attorney General, and Director David M. Cohen, for defendant.

## OPINION

FIRESTONE, Judge.

This contract case comes before the court on the defendant United States' ("government's") motion for summary judgment. At issue are four claims on five contracts awarded to plaintiff Ferguson Propeller, Inc. ("Ferguson") by the United States Naval Sea Systems Command ("NAVSEA"), for the manufacture and delivery of ship propellers. In general, Ferguson claims that it is entitled to compensation for the additional costs it incurred because of (1) alleged problems with government-furnished equipment and (2) "over-inspections" by government quality assurance personnel.[1] For the reasons that follow, the government's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND FACTS

This litigation arises from a series of firm-fixed price contracts that were awarded to Ferguson by NAVSEA in the early and mid-1980s for the manufacture of propellers for several classes of ships. All of the below-noted claims were presented to the contracting officer and denied. Each contract will examined separately.

### I. The Submarine Contracts—Nos. N00024–82–C–4124 and N00024–84–C–4098

The submarine contracts were awarded on March 16, 1982, and October 25, 1983, respectively, for the manufacture of twenty-

---

1. Ferguson originally sought additional costs for delay damages, disruption costs and the costs of claim preparation. Ferguson has formally abandoned those claims and its claims relating to an alleged breach of the duty of good faith and fair dealing with regard to consideration of its claims. The only claims remaining are those identified in this opinion.

four submarine propellers and associated equipment. As far as the claims remaining in this litigation, Ferguson raised the following issues in its combined claim on these two contracts: (1) the government's liability for providing late and defective government furnished equipment, here a ring gage; (2) the government's liability for providing an inaccurate forming die drawing; (3) the government's failure to disclose the existence of a Submarine Propeller Repair Manual ("PRM"), with respect to the first contract (Ferguson claims the PRM included welding requirements that it did not anticipate in pricing the contract); and (4) the government's liability for costs associated with NAVSEA's decision to insist on the presence of a government quality inspector to observe the inspections for every submarine propeller manufactured after February 1988. The government seeks partial summary judgment only with respect to the claims associated with the PRM and the over-inspection.[2]

In connection with the application of the PRM to the first submarine contract, Ferguson does not dispute that the PRM was not directly invoked under the first contract. Plaintiff's Response to Defendant's Motion for Summary Judgment ("Pl.Resp.Br.") 3. However, Ferguson contends that NAVSEA imposed requirements from the PRM on the manufacture of the propellers under the first submarine contract. In particular, Ferguson states that it could not pass the testing requirements without following the manual. The undisputed facts show that, although Ferguson was required to follow the PRM on the second submarine contract and had the PRM before making its bid on the second contract, Ferguson bid the same number of machining hours for each propeller on both contracts. Ferguson contends that the pricing of the second contract is irrelevant because "there were added requirements [in the first contract], and they caused Plaintiff to perform extra work." *Id.* Ferguson

claims $218,905[3] for the increased work it needed to perform to comply with the PRM.

With respect to the "over-inspection" claim, it is not disputed that the two submarine contracts contained Defense Acquisition Regulation (DAR) 7–103.5(a), which was in effect until the Federal Acquisition Regulation ("FAR") took effect on April 1, 1984. *See* FAR clause 52.246–2, "Inspection of Supplies-fixed Price," 48 C.F.R. § 52.246–2 (1985) ("The Government shall perform inspections and tests in a manner that will not unduly delay the work."). On February 4, 1988, NAVSEA invoked its authority to require 100% verification inspections, after Ferguson had demonstrated quality problems with some of its submarine propellers. *See* Defendant's Proposed Findings of Fact ("Def.PFF") ¶¶ 101–02. Imposition of the 100% inspection requirement meant that a government quality inspector was to witness and verify that the inspection performed by Ferguson's inspectors had been performed fully and correctly. *Id.* at ¶ 104. The imposition of the 100% verification inspection did not change the number of points that Ferguson was required to measure. *Id.* at ¶ 107.

In order to carry out the 100% verification requirement, the government assigned two government inspectors to Ferguson's facility. *Id.* at ¶ 119. Ferguson was informed that two quality inspectors were scheduled so that at least one would be on site at all hours during a four-week period, from 8:00 a.m. to 11:30 p.m. on Monday through Friday and 8:30 a.m. to 4:30 p.m. on Saturdays. Mr. Marti, Ferguson's quality assurance manager, testified at his deposition that he did "recall problems with the government [inspectors] being unavailable for inspection" on "some occasions," but could not recall "any specific instance." *See id.* at ¶ 108.

According to the government, the imposition of the 100% verification inspection did not end the quality problems with Ferguson's propellers. *See id.* at ¶¶ 110–12. The 100%

---

2. The government states in its brief that Ferguson's claims relating to the ring gage and the forming die drawing, "do not lend themselves to decision by summary judgment." However, at argument, Ferguson stated that it was no longer seeking additional damages for these items in its claim.

3. On October 29, 2002, Ferguson provided the court with revised claims for each of the contracts. The amounts identified above reflect the revised claim amounts.

verification requirement continued through 1992.

Ferguson claims that the government's insistence on 100% inspection of Ferguson's work by the government's quality inspectors was unreasonable, and that it went on for too long. Ferguson contends that its propellers did not warrant imposition of a 100% verification inspection by the government. Ferguson points to internal government meeting notes that state that Ferguson was manufacturing acceptable propellers before the 100% verification requirement was imposed, and that NAVSEA had been wrong about certain quality problems. Plaintiff's Trial Exhibit ("P. Tr. Ex.") B8 & B5. Ferguson also relies on a December 17, 1990 letter NAVSEA wrote to the Defense Contract Management Agency ("DCASMA") regarding the 100% verification inspection requirement. *Id.* at B4. The letter states, in relevant part, as follows:

> It was not the intent of reference (a) [which imposed a 100 percent verification inspection requirement on February 4, 1988)], to permanently impose a 100 percent verification inspection. The amount of verification inspection, which must be sufficient to ensure high quality propellers, should be discretionary with the local [DCASMA] representatives. Thus, the NAVSEA request in reference (a) ... is rescinded.... This letter should not be construed as a NAVSEA mandate to discontinue 100 percent verification inspection. Rather, the local [DCASMA] organization, because of their first hand experience with the contractor, is best qualified and therefore should determine the amount of verification inspection necessary to assure a quality propeller.

*Id. See also* Def. PFF ¶ 113. Ferguson asserts that despite the recision of the 100% verification inspection requirement, the 100% inspection continued unabated and that Ferguson complained to the government about the delay caused by the requirement. Pl. Tr. Ex. B6. Ferguson also states that at trial it intends to call Frank Halpern, a "recognized expert," to show that Ferguson's propellers were acceptable. Ferguson did not submit a sworn statement from Mr. Halpern to that

effect, however. Ferguson claims $544,339 for the delay associated with having each inspection witnessed.

## II. The Battleship Propeller Contract— No. N00024–86–C–4114

The Battleship Propeller Contract was awarded on November 26, 1985, for the manufacture of eight battleship propellers and other associated equipment. Pursuant to the contract, NAVSEA was to furnish drawings to Ferguson for the manufacture of radial-type fillet gages. Ferguson was then required by the contract to either manufacture or procure the manufacture of the gages. Def. PPF ¶ 22. NAVSEA was not able to furnish the drawings for radial type fillet gages. *Id.* at ¶ 23. In response, Ferguson offered to produce normal-type fillet gages. Ferguson offered to produce both the drawings and the gages. *Id.* Ferguson had the drawings completed by July 1986. Thereafter, Ferguson issued a purchase order to New Technology Precision Machining for gage sets in accordance with Ferguson's drawings. *Id.* at ¶ 27. On January 13, 1987, the battleship contract was modified to require Ferguson, instead of NAVSEA, to provide fillet gages and two original propeller blade gage drawings. The contract modification states, in relevant part: "The purpose of this modification ... is to make a specification change to require the Contractor to provide fillet gages and two original propeller blades gage drawings, initially intended to be furnished as Government Furnished Equipment." Defendant's Trial Exhibits ("Def. Tr. Ex.") 104. The contract price was modified to give Ferguson $5700 to pay for the drawings. Def. PFF ¶ 29.

Ferguson delivered the new drawings to NAVSEA on June 2, 1987. In the meantime, Ferguson had already ordered and received the gages. *Id.* at ¶¶ 30–31. It is not disputed, however, that NAVSEA accepted the drawings in writing on January 19, 1988. Def. Tr. Ex. 111. Ten days later, Ferguson shipped the first battleship propeller. Def. PFF ¶ 32.

The parties do not dispute that there were errors on the gage drawings that were carried over to the gages that Ferguson had

manufactured. *Id.* at ¶ 33. Ferguson did not learn of the errors until mid–1993, during an investigation of its claims by NAVSEA. *Id.* at ¶ 35.

Ferguson claims $147,941 for the incremental costs associated with not having proper gages. Ferguson argues that the government owes that amount plus $27,028, on the grounds that Ferguson assumed the government's responsibility in producing both the drawings and the gages and because the government approved the drawings that Ferguson used for the manufacture of the gages.

### III. The Stock Contract—No. N00024–86–C–4221

The Stock Contract was awarded on January 17, 1986 for the manufacture of seven propellers for five different classes of ship and other associated equipment. Ferguson claims that the government is liable for the cost of new edge gages that Ferguson procured in order to comply with the contract. Ferguson claims that the edge gages provided by the government were defective because the gages would not check the maximum allowable tolerance for certain propellers. Pl. Tr. Ex. F7.

Four years after the contract was awarded, in 1990, Ferguson wrote to NAVSEA asking permission to purchase new edge gages. Def. PFF ¶ 39. As Ferguson explained in the letter to NAVSEA, the gages supplied by the government were made, "20 to 30 years ago when prescribed gap opening was only .015 [inches]. As you know, since then the recommended gap opening has been substantially increased for ease in manufacture and to prevent standoff on refit propellers." *Id.;* Def. Tr. Ex. 148. Ferguson purchased and received permission to use the new gages in 1991. Def. PFF ¶¶ 46–48. Previously, Ferguson had been asked to submit a cost proposal but failed to do so. *Id.* at ¶ 41. The final approval letters from NAVSEA state: "The action taken by this letter is considered to be within the scope of the subject contract. No change in contract de-

liveries or completion dates or in the current negotiated price or amount of this or any Government contract is authorized." Def. Tr. Ex. 167, 171. Ferguson claims that it is entitled to $26,238 for both the cost of the new gages.

Ferguson also seeks $33,651 for the delay caused by the government's 100% verification inspection requirement for these propellers. Ferguson's objections to the imposition of the 100% verification inspection requirement are the same as they are with respect to the submarine contracts.

### IV. The CVA Propeller Contract—No. N00024–87–C4159

The CVA Propeller Contract was awarded on February 27, 1987, for the manufacture of twelve aircraft carrier (CVA67 class) propellers. The contract provided that Ferguson was to use the same inspection gages and blade patterns that it had used on a prior subcontract with Newport News Shipbuilding for the same type of propellers. The edge gages had changed over the years to allow for easier use and for measurement of the maximum thickness tolerances for a propeller design. Ferguson raised the issue of new gages in 1990 and requested permission to use new gages. Def. PFF ¶ 75. The government did not dispute the fact that the old edge gages would not test to the maximum tolerances. Pl. Tr. Ex. D1 ("Ferguson is saying that the edge gage openings are not wide enough to put the edge gages onto the propeller blades for inspection. Yes, [Ferguson is] right.").

On September 9, 1991, NAVSEA granted Ferguson permission to use the new gages. The approval letter states that "[t]he action taken by this letter is considered to be within the scope of the subject contract. No change in contract deliveries or completion dates or in the current negotiated price or the amount of this or any Government contract is authorized." Def. PFF ¶ 76. Ferguson is seeking the cost of the new gages [4] and the additional

---

4. In its claim, Ferguson states that NAVSEA asked Ferguson for a proposal to modify the cylindrical and fillet gages. Def. PFF ¶ 64. Although Ferguson was allowed to make drawing changes concerning the fit of the cylindrical and fillet gages, Ferguson does not dispute the government's contention that "[n]one of the three changes requested by Ferguson made any signifi-

inspection time caused by having to use allegedly defective gages for a period of time under the contract.

The contract called for the government to furnish Ferguson with propeller blade patterns for casting the propellers. Ferguson claims that the government delayed providing Ferguson with any blade patterns and, thus, Ferguson was directed to use the patterns it had used under the earlier Newport News contract. *Id.* at ¶ 79. Ferguson's claim is based on its contention that the Newport News patterns, which it was directed to use, were not suitable. Ferguson contends that the patterns were worn and limber and could not consistently produce satisfactory castings. *Id.* at ¶ 88. NAVSEA had apparently sent Ferguson another set of patterns, but those had been returned. *Id.* at ¶ 85. Ferguson explained in its claim that they were returned because they had approval to use the Newport News patterns. *Id.*

It is not disputed that Ferguson had been able to manufacture four propellers with the old Newport News patterns without problems, but that it had trouble with the fifth. *Id.* at ¶ 89. Eighteen months after it had completed casting the last propeller in 1991, Ferguson indicated that the old patterns had "reached or are nearing the end of their useful lives." Def. Tr. Ex. 220 at 2; Def. PFF ¶ 88. In response, Ferguson apparently reworked the patterns. Def. PFF ¶ 93. Ferguson is claiming $558,861 for the additional costs associated with reworking the old patterns and the castings they produced.

## DISCUSSION

### I. Standard of Review

#### A. Summary Judgment

Summary judgment is appropriate where there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Rules of the

United States Court of Federal Claims ("RCFC") 56(c); *Golden Pac. Bancorp v. United States,* 15 F.3d 1066, 1071 (Fed.Cir. 1994); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, if the nonmoving party produces sufficient evidence to raise a question that would alter the outcome of the case, summary judgment must be denied. In making this determination, the court is mindful that any doubt over a factual issue must be resolved in favor of the nonmoving party. *Id.* at 587–88, 106 S.Ct. 1348.

The party moving for summary judgment has the initial burden of pointing out the absence of any genuine disputes of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant discharges this burden, the non-movant must demonstrate specific facts showing a genuine dispute of fact for trial. *Matsushita Elec.,* 475 U.S. at 586–87, 106 S.Ct. 1348; *Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed.Cir.1994). Thus, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (citation omitted); *see also Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[T]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit."); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In this connection, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to

---

cant modification in the manufacture and inspection of the propellers or in the affected gages. The drawing changes simply made the manufacture and inspection of the propellers easier." Defendant's Motion for Summary Judgment ("Def. Mot. for SJ") 15. There was no evidence presented to show that the gages were defective.

In fact, the only gages that were modified were the edge gages. Def. PFF ¶ 65. In its response brief, Ferguson only makes specific mention of the facts to support its claim for new "edge gages." Pl. Resp. Br. 6–7. Ferguson's claims with respect to the other gages are deemed withdrawn.

the material facts." *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348.

## B. Facts Deemed Admitted

Here, Ferguson failed to file a "Statement of Genuine Issues" required by RCFC 56(d)(2), and did not submit any declarations, affidavits or other verified written testimony. RCFC 56(d)(3) provides:

> In determining any motion for summary judgment, the court will, absent persuasive reason to the contrary, deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are included in the Statement of Genuine Issues and are controverted by affidavit or other written or oral evidence.

Having failed to specifically dispute the Defendant's Proposed Findings of Uncontroverted Facts, the court deems those facts admitted, except to the extent that Ferguson has identified specific exhibits in its March 14, 2002 Response to Defendant's Motion for Summary Judgment or at oral argument, which demonstrate that material facts are controverted. *See Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1353 (Fed.Cir.2001) (citing *Barmag Barmer Maschinenfabrik AG. v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984)); *Pure Gold, Inc. v. Syntex*, 739 F.2d 624, 626–27 (Fed.Cir.1984) ("To counter a motion for summary judgment, specific facts, and not mere assertions of counsel or conclusory statements, must be set forth to demonstrate that a genuine issue of material fact exists."); *Myers Investigative and Sec. Servs., Inc. v. United States*, 47 Fed. Cl. 605, 613 (2000).

## C. Equitable Adjustments

■ In seeking an equitable adjustment, a contractor bears the burden of establishing liability, causation, and damages. *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956 (1965). Meeting this burden is difficult. The contractor must establish by a preponderance of the evidence that a change in requirements was imposed and that the change in requirements caused the increased costs. *Servidone Constr. Corp.*

*v. United States*, 931 F.2d 860, 861 (Fed.Cir. 1991); *Bath Iron Works Corp. v. United States*, 34 Fed.Cl. 218 (1995), *aff'd by* 98 F.3d 1357 (Fed.Cir.1996); *Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 458 (1993). The court reviews the contracting officer's denial of an equitable adjustment de novo. *Wilner v. United States*, 24 F.3d 1397, 1402 (Fed.Cir.1994). Therefore, the issue before the court is not the correctness of the contracting officer's decision; rather the burden is on the plaintiff to establish, in the first instance, that it is entitled to the equitable adjustment claimed. *Bath Iron Works*, 34 Fed.Cl. at 231; *Ralph L. Jones Co., Inc. v. U.S.*, 33 Fed.Cl. 327, 331 (1995).

## II. Ferguson's Claims

### A. The Submarine Contracts—Nos. N00024–82–C–4124 and N00024–84–C–4098

#### 1. The Submarine Propeller Repair Manual

■ Ferguson claims that the Navy imposed the requirements of the PRM on Ferguson's manufacturing operations for the first submarine even though the PRM had not been identified for the first submarine contract. Ferguson concedes that the PRM was identified for the submarine propellers that were ordered under the second contract. Ferguson states that it anticipated that welding under the first submarine contract would be relatively routine and thus it bid only 550 hours per unit. Ferguson contends that because of the extra welding requirements mandated by the PRM, Ferguson incurred an additional 210 hours per unit. Pl. Tr. Ex. C7. Ferguson argues that where the government imposes additional requirements on the contractor, which exceed the expectations set at the time of the contract award, the government is obligated to reimburse the contractor for the extra work it was required to perform above and beyond the initial contract requirements. *See Cavalier Clothes, Inc. v. United States*, 51 Fed.Cl. 399 (2001); *Delco Elec. Corp. v. United States*, 17 Cl.Ct. 302, 322–23 (1989). Ferguson seeks $218,000 in additional manufacturing costs.

The government argues, on summary judgment, that Ferguson has failed to demonstrate that imposition of the PRM caused any additional costs.[5] In particular, the government contends that Ferguson bid the same unit price for propellers under the first submarine contract, which did not require the PRM, as it did for identical propellers under the second submarine contract, which required compliance with the PRM. Def. PFF ¶ 20. ("Ferguson's reconciliation of its bids for contracts 4124 and 4098 shows that it bid 2750 machining hours for each propeller under both contracts."). In such circumstances, the government contends that Ferguson has failed to demonstrate "causation," because the PRM did not make any difference in Ferguson's bid on the second submarine contract.

Ferguson argues in response that the amount Ferguson bid on the second submarine contract is "irrelevant." Pl. Resp. Br. 3. According to Ferguson, so long as it had to do additional work that was not required under the first contract, it is entitled to compensation.

The court agrees with the government that it is entitled to summary judgment on this issue. Ferguson has failed to establish a genuine issue of material fact as to whether the alleged change in requirements "caused" any increase in Ferguson's costs. Plaintiff must establish both that (1) requirements were added and (2) the additional requirements caused the increase in costs. *See Wilner*, 24 F.3d at 1401 ("[W]hen the claim being asserted by the contractor is based upon alleged government-caused delay, the contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor."). *See also Servidone Constr. Corp*, 931 F.2d at 861; *Bath Iron Works*, 34 Fed.Cl. 218; *Mega Constr. Co.*, 29 Fed.Cl. at 458. Where, as here, Ferguson concedes that it bid the same number of machining hours for all of the submarine propellers, regardless of whether the PRM applied or not, the court has no basis to find that Ferguson would have bid

more hours on the first submarine contract had it known that compliance with the PRM would be required. Absent some evidence to refute the government's showing that application of the PRM did not make any difference in Ferguson's pricing of the propellers, the court has no basis upon which to find that imposition of the PRM on the first submarine propeller contract "caused" the increased hours in manufacturing. Since Ferguson bid the same price with and without the PRM, application of the PRM was not relevant to pricing. The government is therefore entitled to summary judgment on this issue.

### 2. The 100% Inspection Verification Requirement

■ Ferguson also claims that it is entitled to increased costs under both submarine contracts associated with the government's decision to impose a 100% inspection verification requirement for all of Ferguson's submarine propellers, after February 4, 1998. In the alternative, Ferguson asserts that even if imposition of the 100% verification inspection requirement was initially justified, 100% verification inspection continued longer than was necessary. Ferguson relies upon several government documents to show that the government had overstated Ferguson's quality problems. Pl. Tr. Ex. B2, B5 & B8. Ferguson also relies upon NAVSEA's December 17, 1990 memorandum to DCASMA to the effect that the February 4, 1988 request for 100% verification inspections was not intended to be permanent and that the 100% verification requirement was rescinded. *Id.* at B4.

The government argues that it is entitled to summary judgment with respect to this claim on the ground that, under the FAR, the government is entitled to require 100% verification inspections and that Ferguson has failed to demonstrate that imposition of the 100% verification inspection requirement was "unreasonable."

There is no doubt that the government had the authority under the submarine contracts, and the other contracts at issue, in this case

---

**5.** The government disputes the fact that it imposed the Manual requirements on Ferguson un-

der the first contract. Charles R. Crockett Declaration, Def. Mot. for SJ App. ¶ 4.

to require 100% verification inspections. However, the government's rights are not without limits. The FAR explicitly requires that the government perform its inspection activities in a manner that will not "unduly delay" the contractor's work. 48 C.F.R. § 52.246–2 (2002). Just how much delay is reasonable is a question of fact and depends upon the impact the delay has on the contractor's performance.

Here, Ferguson claims at the outset that the government should have never imposed the 100% verification inspection requirement on Ferguson. Ferguson has not, however, presented any evidence that the government's decision to impose a 100% verification requirement was not justified. Ferguson's reliance on the alleged testimony of Mr. Halpern without a sworn statement is misplaced. Ferguson needed to submit evidence to support its assertion. In addition, Ferguson did not present any evidence to show that before December 1990, when the 100% verification inspection requirement was rescinded, the inspection requirement caused any delay. All of Ferguson's evidence of delay postdates December 1990. Absent evidence that the initial imposition of the 100% verification inspection was not supported or caused delay before it was rescinded, Ferguson has failed to present a genuine issue of material fact that precludes summary judgment on this aspect of Ferguson's claim. Accordingly, the government is entitled to summary judgment on the portion of Ferguson's claim that predates rescission of the 100% verification inspection requirement, on December 7, 1990.

■ Ferguson has, however, presented evidence to show that the government's continued imposition of the 100% verification requirement, after it was rescinded in December 1990, was not justified and did result in delays. Ferguson presented evidence to show that in April 1991, it complained to the government about its 100% verification inspection requirement and how the "excessive" inspection requirement was delaying Ferguson's job performance. Specifically, Ferguson complained to the government that the inspection requirement, "has in effect resulted in a 'work rule slow down.' We cannot survive under these circumstances."

Pl. Tr. Ex. B6. Ferguson also submitted evidence to show that the government's concerns with Ferguson's quality after December 1990 did not continue to justify a 100% verification inspection program. *Id.* at B5 & B8.

If the government did in fact engage in excessive inspections that resulted in delay after December 1990, it may be liable for damages. *See Lathan Co. v. United States,* 20 Cl.Ct. 122 (1990); *Roberts v. United States,* 174 Ct.Cl. 940, 357 F.2d 938 (1966). There are disputed issues of fact over whether the government's continued application of the 100% verification inspection requirement after December 1990 was justified and issues of fact as to whether those inspections caused delay. These disputed issues of fact preclude the court from granting summary judgment to the government on this portion of Ferguson's excessive or "over-inspection" claim. *See Lathan Co.,* 20 Cl Ct. at 129. Accordingly, the government's motion for summary judgment regarding Ferguson's "over-inspection" claim for delay damages after December 1990 is denied.

### B. The Battleship Contract—No. N00024–86–C–4114

■ In its claim under the battleship contract, Ferguson seeks to hold the government liable for the problems associated with certain "normal-type" fillet gages that Ferguson designed and procured after NAVSEA informed Ferguson that it could not provide the "radial-type" fillet gages called for under the contract. As noted above, in January 1987, after Ferguson had contracted for the new "normal-type" gages, the government modified the contract, "to require the Contractor to provide fillet gages and two original propeller blades gage drawings, initially intended to be furnished as Government Furnished Equipment." Def. Tr. Ex. 104. It is also undisputed, however, that the government approved Ferguson's drawings for the gages.

As it turned out, the fillet gage drawings had errors, which were carried over to the manufacture of the gages. These defective gages led to the production of defective blades that needed to be fixed. Ferguson

seeks damages for both the extra inspection time and grinding and finishing time needed for the battleship blades.

The government contends that once Ferguson assumed responsibility for the fillet gages, Ferguson undertook the responsibility to perform the obligation correctly and cannot hold the government responsible of Ferguson's defective gage drawings. The government argues, citing *Austin Co. v. United States*, that once Ferguson assumed responsibility for the "normal-type" gages, which were different than those the government had proposed to furnish, Ferguson assumed the risk that the gages were suitable. *Austin Co. v. United States*, 161 Ct.Cl. 76, 314 F.2d 518, 520–21 (1963), *cert. denied* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963) (court denied plaintiff recovery when plaintiff proposed modifying the contract by altering the government's specifications, even after plaintiff discussed the plans with the government and the government incorporated the proposal into the contract specifications).

Ferguson argues that the government, having contracted for both the design and manufacture of the gages with Ferguson, assumed the risk that once it accepted the gage design the gages would be suitable. *See Hickman Sea Sled*, ASBCA No. 3008, 57–1 BCA ¶ 1177, 1957 WL 156; *E.L. Cournand & Co., Inc.*, ASBCA No. 2955, 60–2 BCA ¶ 2840, 1960 WL 6556. In *Hickman* the Board found the government liable for problems with propellers which had been designed by the contractor, under an earlier design contract. *Hickman Sea Sled*, ASBCA No. 3008, 57–1 BCA ¶ 1177. The Board held that the contractor could rely upon the specifications that had been approved by the government under the earlier contract, even though the same contractor did both the design and manufacture. *Id.* A careful reading of *Hickman* shows, however, that the Board held the government liable for the contractor's specifications because the government had dictated the composition of the propellers.

Here, the court finds that the government is not liable for the gage design problems which led to defective propellers. In contrast to *Hickman* and *E.L. Cournand*, there is no basis in this case upon which to find that the government made any warranties about the gages Ferguson agreed to design and manufacture. The fact that the original gages were to be GFE does not alter this result. Once Ferguson undertook the obligation to design and manufacture the type of gage it wanted to use under the contract, as opposed to the gage called for under the contract, Ferguson assumed responsibility for properly performing the work. *See Austin*, 314 F.2d at 520–21 ("[P]laintiff drew up the specifications and thereby undertook a firm obligation to perform thereunder. In this climate plaintiff must turn the same square corners as required of the Government and is bound by specifications of its own making."). Further, the fact that the government approved the drawings did not create a government warranty. *See Aleutian Constructors v. United States*, 24 Cl.Ct. 372, 378 (1991) (citing *Austin*, 161 Ct.Cl. 76, 314 F.2d 518) ("When defendant has provided design specifications and drawings, and plaintiff persuades defendant to change them in accordance with plaintiff's ideas, plaintiff assumes the risk that performance under its proposed specifications may be impossible. In general, the party that drafts, or changes, design specifications is responsible for losses suffered by the other party due to defects in the specifications."). In short, Ferguson cannot hold the government liable for gages that were not "furnished" by the government to Ferguson. The government is entitled to summary judgment on Ferguson's battleship contract claim.

### C. The Stock Contract No. N00024–86–C–4221

■ Ferguson claims that the GFE edge gages provided under the contract were defective because they did not allow Ferguson to measure for the maximum allowable tolerances called for by the contract.[6] The undis-

---

6. Ferguson relies upon a preliminary report by government auditors, the 1992 report by Roy H. Stoeckel to support its contention that the gages were defective. Pl. Tr. Ex. F7–10. This exhibit

also contains a recommendation that the government pay for the new gages. *Id.* at 13. This, however, was a preliminary report and not the final report of the contracting officer. *Id.* at

puted facts show that four years after the contract was awarded, Ferguson requested and received permission from the government to use new gages that would test for the maximum allowable tolerance. Each of the approval letters contained the following language, "The action taken in this letter is considered to be within the scope of the subject contract. No change in contract deliveries or completion dates or in the current negotiated price of amount of this or any Government contract is authorized." Def. PFF ¶ 49. Ferguson claims that the government agreed to pay for the new gages. The government, however, has no record of this commitment. *Id.* at ¶¶ 43 & 45. Ferguson also claims that the government is liable for increased inspection time caused by use of the older gages.

The government argues that Ferguson is not entitled to the cost of new gages or increased inspection time, on the grounds that Ferguson has not established that the original gages were defective. According to the government, the fact that Ferguson was allowed to substitute gages does not mean that the original gages were defective, but rather that the new gages were simply easier to use. According to the undisputed statements of Mr. Crockett, the Director of the Hydrodynamics Group in the Warfare Systems Directorate, at NAVSEA:

> It is true that a wider gap in the edge gage will make it easier to manufacture the propeller, but that does not mean that the gages in their original configuration were defective. When Ferguson proposed modifying the gages to widen the gap, the Navy agreed and asked Ferguson to submit a proposal for such modifications. To my recollection it never did so. The issue was resolved when the Navy gave Ferguson permission to use the new edge gages manufactured with a wider gap.

Crockett Decl. ¶ 9. The government also points to the approval letters from NAVSEA to Ferguson which state that Ferguson will be allowed to use the new gages "without cost to the government." The government contends that in such circumstances, Ferguson is not entitled to any additional costs under the contract.

While the government does not dispute that the original gages would not check for the maximum allowable tolerances authorized under the contract, this limited capability does not mean that the gages were "defective." The fact that newer gages would make it easier to comply with government testing requirements does not mean that the older gages were "unsuitable" for their intended use. Rather, Ferguson's argument is based on its contention that the old gages were not "optimal" for their purposes. Ferguson was aware of the government's gage requirements before it bid on the contract and agreed to use those gages. Indeed, Ferguson had manufactured propellers for the Navy using the same gages as called for under the contract. In such circumstances, Ferguson has failed to raise a genuine issue of fact to support its "defective" gage claim. *See Space Age Engineering, Inc.,* ASBCA Nos. 25761 et al., 86–1 BCA ¶ 18611, 1985 WL 17300 ("The closest evidence to support its contention [that the GFE is defective] is that after appellant had used three heavy-duty forklifts for over a year it decided that they were too heavy .... We conclude the most this shows is that after using these three forklifts for a year appellant decided that smaller, more maneuverable forklifts would be better."). The government is entitled to summary judgment on this issue.

Ferguson also claims that the government's decision to continue with 100% verification inspections after December 1990 was not justified and unreasonably delayed Ferguson. The same issues that preclude summary judgment for the government, in connection with this issue under the submarine contract, preclude summary judgment under this contract as well. Accordingly, the government's motion for summary judgment with respect to Ferguson's "over-inspection" claim under the stock contract is denied.

### D. CVA Contract—No. N00024–87–C–4159

▮▮▮ Ferguson asserts three claims under the CVA contract. First, under the

---

F10–2. The claim was denied because Ferguson had failed to show that the original gages, which Ferguson had used in the past to manufacture propellers were "defective." *Id.*

terms of the contract, the propellers were to be manufactured in accordance with the Bureau of Ships' ("BUSHIPS"') Drawing No. 203–2482649. The undisputed facts show that Ferguson asked and received permission from the government to make three changes to the drawing notes for the CVA propeller. These changes concerned the fit of cylindrical and fillet gages during the inspection of the propeller. Def. PFF ¶ 58. Ferguson has not disputed the government's contention that "[n]one of the three changes requested by Ferguson made any significant modification in the manufacture and inspection of the propellers or in the affected gages. The drawing changes simply made the manufacture and inspection of the propellers easier." *Id.* at ¶ 59. Ferguson has not presented any evidence to counter this contention. In such circumstances, Ferguson's claim for an equitable adjustment, on the grounds that the drawing was defective, must be rejected. A contractor is not entitled to an equitable adjustment when the government permits it to use an easier test to meet contract compliance. *See Martin J. Simko Constr., Inc. v. United States*, 11 Cl.Ct. 257, 289 (1986), *vacated by* 852 F.2d 540 (Fed.Cir.1988). The government is entitled to summary judgment on this aspect of Ferguson's claim.

 Ferguson also claims that it is entitled to an equitable adjustment on the grounds that the edge gages for the CVA contract were defective as they were under stock contract. In both instances, Ferguson asked and received permission to use newer edge gages to test its propellers. In both instances, the government granted Ferguson permission in a letter stating that the new gages would not change the contract "price." Def. PFF ¶ 76.

It is not disputed that the edge gages provided for under the contract did not allow Ferguson to test for maximum allowances. The sole issue is whether this makes the gages defective. The government argues that the gages were not defective for the CVA contract because they had been previously used by Ferguson on the earlier Newport News contract. The government also contends that since Ferguson had just used

those gages, it had an obligation to raise the issue at the time it bid on the CVA contract.

The court finds that Ferguson has failed to raise a material issue of fact regarding whether the edge gages were "defective." Again, the fact that the gages were not optimal does not mean they were defective. Ferguson bid the contract and had manufactured similar propellers using the same edge gages that it now claims were defective. *Space Age Engineering, Inc.*, ASBCA Nos. 25761 et al., 86–1 BCA ¶ 18611. *See also Specialty Assembling & Packing Co. v. U.S.*, 174 Ct.Cl. 153, 355 F.2d 554, 561–64 (1966). The government is entitled to summary judgment on this aspect of Ferguson's claim.

Third, Ferguson claims that it is entitled to damages relating to the blade patterns used to manufacture the propellers under the CVA contract. In particular, Ferguson charges that the blade patterns the government ordered Ferguson to use under the contract were not suitable after a period of time because of age. Ferguson agrees that the patterns, "were satisfactory for four propellers, but have now worn and become limber and are causing production problems on the remaining eight propellers." Def. PFF ¶ 88. Ferguson nonetheless failed to bring the issue to the government's attention until 1991, eighteen months after Ferguson finished casting the last propellers. *Id.* at ¶ 91. Apparently, Ferguson on its own had modified the patterns to correct the casting problems it was having with the patterns. *Id.* at ¶ 93. Ferguson argues that because the patterns became "defective" it is entitled to the excess work needed to finish the propellers.

The government contends that Ferguson has failed to demonstrate that the patterns became "defective" and, thus, Ferguson is not entitled to an equitable adjustment for this aspect of its claim, as a matter of law. In addition, the government charges that Ferguson had an obligation to timely notify the government of the problems with the patterns. The government argues that Ferguson's late notice of the issue demonstrates that Ferguson was simply informing the government, after all the blades had been cast, that new patterns would be needed for any casting in the future. Ferguson did not con-

tend, until it filed its claim, that the patterns were "defective."

■■■■ The court finds that the government is entitled to summary judgment on this issue. Ferguson cannot hold the government liable for delays associated with working on blades manufactured with allegedly defective blade patterns when Ferguson elected to change the patterns as opposed to informing the government of its problem with the patterns. A contractor cannot place upon the government responsibility for the time the contractor spent in reworking the defective patterns instead of informing the government of the problem so that it could resolve the matter. *See Kings Electronics Co. v. United States*, 169 Ct.Cl. 433, 341 F.2d 632, 635–36 (1965). Here, Ferguson did not inform the government of its problems with the blade patterns until all the blades had been cast. Ferguson does not dispute that, rather than inform the government of its problem with the patterns, it elected instead to modify and repair the patterns. Def. PFF ¶ 93. In such circumstances, the government is not liable for Ferguson's increased costs allegedly caused by problems with the blade patterns. The government is entitled to summary judgment on this aspect of Ferguson's claim.[7]

## CONCLUSION

In view of the foregoing, the government's December 19, 2001 motion for summary judgment is hereby **GRANTED IN PART** and **DENIED IN PART**.

Genuine issues of material fact exist as to the plaintiff's claim for over-inspection after the December 1990 rescission of the 100% verification inspection requirement. The court will contact the parties in **September 2003** to set a trial date and a schedule for pretrial submissions.

---

[7]. The government also sought summary judgment on the grounds that Ferguson presented a total cost claim. Given Ferguson's agreement that its total cost claim is not viable, the issue is now moot.